ANTHONY J. BRASS (CASBN. 173302)
Attorney at Law
3223 Webster Street
San Francisco, California 94123
Telephone: (415) 922-5462
Facsimile: (415) 346-8987
tony@brasslawoffice.com

Attorney for Defendant
Eric Allen Rombough

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **Case No. 4:23-CR-00269-002 JSW** |
| Plaintiff, | ) |
| | ) DEFENDANT ERIC ALLEN |
| v. | ) ROMBOUGH'S SENTENCING |
| | ) MEMORANDUM |
| | ) |
| | ) Date:   March 24, 2026 |
| ERIC ALLEN ROMBOUGH, | ) Time:  1:00 p.m. |
| | ) |
| Defendant. | ) Hon. Jeffrey S. White |
| | ) United States District Court |
| | ) |
| _____ | ) |

TO THE HONORABLE JEFFREY S. WHITE, SENIOR UNITED STATES DISTRICT

JUDGE:

Defendant Eric Allen Rombough, by and through counsel, respectfully submits this sentencing

memorandum pursuant to 18 U.S.C. § 3553(a). Mr. Rombough acknowledges the seriousness of

his offenses, accepts full responsibility, and asks the Court to impose a sentence "sufficient, but

not greater than necessary" to accomplish the purposes of sentencing.

## I.    INTRODUCTION

This case involves a former law enforcement officer who betrayed the public trust and violated the civil rights of others. Mr. Rombough pled guilty to Count One (18 U.S.C. § 241) and Counts Six and Seven (18 U.S.C. § 242), admitted the wrongful nature of his conduct, and has expressed genuine remorse for the harm caused to the victims, his family, and the Antioch community.

At the same time, the record reflects an early and sustained acceptance of responsibility, a lack of any prior criminal history, compliance on release, and significant personal and mental-health factors that the Court may consider under § 3553(a). The Presentence Investigation Report (PSR) calculates an advisory guideline range of 78 to 97 months (Total Offense Level 28; Criminal History Category I) and recommends a below-guideline sentence of 65 months. Mr. Rombough respectfully submits that a below-guideline sentence best satisfies the statutory goals.

Accordingly, Mr. Rombough respectfully asks the Court to minimize the custodial component of his sentence, followed by three years of supervised release with appropriate conditions, restitution as ordered by the Court, waiver of any fine, the mandatory special assessment, and voluntary surrender.

## II.   PROCEDURAL POSTURE

On August 16, 2023, a nine-count indictment charged Mr. Rombough and others with civil rights offenses. Mr. Rombough pled guilty on January 14, 2025, to Counts One, Six, and Seven. He has remained compliant with conditions of pretrial release and has appeared for all proceedings.

The PSR (prepared December 5, 2025; disclosed January 27, 2026) calculates the advisory guideline range and includes the probation office's sentencing recommendation, summarized below.

## III.   ADVISORY GUIDELINES

The PSR applies USSG §2H1.1 and cross-references §2A2.2 for the underlying conduct. The PSR treats multiple underlying offenses as separate count groups, yielding a Combined Adjusted Offense Level of 31, then applies a three-level reduction for acceptance of responsibility under USSG §3E1.1, for a Total Offense Level of 28.

With a Criminal History Category of I (no prior convictions), the advisory guideline imprisonment range is 78 to 97 months. The Guidelines are advisory, and the Court must also consider the § 3553(a) factors.

## IV.   LEGAL STANDARD

The Court must impose a sentence "sufficient, but not greater than necessary" to satisfy the purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation 18 U.S.C. § 3553(a). The Court may vary from the Guidelines when warranted by an individualized assessment. See Gall v. United States, 552 U.S. 38 (2007).

## V.   APPLICATION OF THE § 3553(a) FACTORS

A.    The Nature and Circumstances of the Offense (§ 3553(a)(1))

Mr. Rombough does not minimize the gravity of these offenses. The conduct described in the PSR represents a profound breach of constitutional duty and public trust. The harm extends beyond physical injury, eroding confidence in law enforcement and harming the Antioch community.

But the "nature and circumstances" factor is not limited to condemnation; it also requires a calibrated sentence based on what happened and what is necessary going forward. Here, the PSR notes: (1) Mr. Rombough pled guilty; (2) he did not obstruct justice; (3) he complied with supervision; and (4) he provided a written statement accepting responsibility and describing his remorse. A sentence below the advisory range still reflects the seriousness of the conduct while accounting for these individualized considerations.

B.     History and Characteristics of the Defendant (§ 3553(a)(1))

1.     No Criminal History; Strong Evidence of Law-Abiding Life Before the Offense

Mr. Rombough has no prior criminal convictions and is properly placed in Criminal History Category I. His prior record does not suggest a pattern of criminality outside the period of offense conduct.

Mr. Rombough has also submitted letters of support that speak powerfully to his character, work ethic, and role in his community. As set forth in **Exhibit B**, Mr. Rombough's employer describes him as an exceptional employee who has risen to the top tier of performance through diligence, honesty, and professionalism, noting that Mr. Rombough was forthcoming about his circumstances and consistently demonstrated integrity, reliability, and a calm, driven demeanor in the workplace. Likewise, **Exhibit C** contains a letter from long-term neighbors and friends who attest to Mr. Rombough's kindness, consideration, and positive presence as a neighbor, husband, father, and community member, emphasizing his willingness to help others and his consistent display of good character in everyday life. Together, these letters provide the Court with a meaningful picture of Mr. Rombough as a responsible, productive individual who has the strong support of his employer and community.

2.     Compliance on Release; Low Risk of Flight or Danger

Mr. Rombough was released on bond and has remained compliant with conditions. The PSR identifies him as an appropriate candidate for voluntary surrender.

3.    Mental Health and the Need for Treatment

The PSR documents a PTSD diagnosis and prior counseling, with services interrupted in 2024. The Court may consider mental health history both as mitigation and as a basis for treatment-oriented conditions on supervision. A below-guideline sentence coupled with structured mental-health treatment on supervised release advances rehabilitation and reduces risk of future harm.

Mental Health History and Current Psychiatric Condition

A comprehensive psychiatric evaluation was performed by Vladimir Bokarius, M.D., Ph.D., QME, on March 11, 2024, following an in-person clinical interview and extensive psychological testing. The report is attached hereto as Exhibit A.  In pertinent part, the report indicates that Dr. Bokarius evaluated Mr. Rombough's psychiatric functioning, reviewed approximately 282 pages of records, and issued formal diagnostic conclusions. Dr. Bokarius reports that Mr. Rombough is a 44-year-old married male and former law enforcement officer who served as a City of Antioch police officer from 2018 through 2023, including as a SWAT officer responding to high-risk incidents such as active shooters and hostage rescues.

The evaluation identifies a significant traumatic event occurring on December 10, 2021, during which Mr. Rombough was involved in a SWAT call where a suspect allegedly fired approximately 70 rounds at responding officers and was ultimately killed after being shot by multiple officers, including Mr. Rombough. Mr. Rombough reported that this was the first time he had ever used lethal force. He further reported he was not permitted to debrief following the incident and was placed on administrative leave.

Following this incident, Dr. Bokarius documents that Mr. Rombough developed significant psychiatric symptoms consistent with post-traumatic stress, including nightmares, intrusive thoughts, hypervigilance, irritability, avoidance behaviors, and sleep disturbance. Dr. Bokarius also notes that Mr. Rombough experienced compounding emotional distress associated with administrative investigations, media exposure, and fear of incarceration, resulting in additional anxiety symptoms.

Diagnoses and Clinical Findings

Dr. Bokarius diagnosed Mr. Rombough with multiple psychiatric disorders, including:

- Post-Traumatic Stress Disorder (PTSD) linked to the December 10, 2021 shooting

- Adjustment Disorder with Anxiety, attributed to administrative investigations, media exposure, federal investigation, and fear of imprisonment

- Major Depressive Disorder, Moderate (noted as pre-existing)

- Insomnia Disorder

- Mild Alcohol Use Disorder

- Significant symptoms of anger and perceived discrimination/persecution related to his workplace treatment

Dr. Bokarius assigned Mr. Rombough a Global Assessment of Functioning (GAF) score of 51, reflecting moderate impairment in psychological, social, and occupational functioning. Importantly, the evaluator found that Mr. Rombough experiences episodic suicidal ideation, though without an active plan or intent, and documented substantial depressive symptoms including anhedonia, diminished motivation, and impaired concentration.

Psychological Testing and Severity Indicators

The report incorporates extensive psychological testing, including validated PTSD and depression instruments. Mr. Rombough scored 63 on the PCL-5 PTSD Checklist, which is well above the threshold for PTSD and consistent with a DSM-5 PTSD diagnosis.

The CAPS-5 Clinician-Administered PTSD Scale likewise supported a PTSD diagnosis, confirming that Mr. Rombough met the DSM-5 symptom cluster criteria and that the condition caused clinically significant functional impairment. Testing also reflected high levels of somatic symptoms and clinically significant distress.

Functional Impairment and Life Consequences

Dr. Bokarius found that Mr. Rombough's psychiatric condition has substantially impaired his daily functioning. Mr. Rombough reported that he has withdrawn from activities he previously enjoyed, avoids public events and crowds, struggles with concentration and memory, and experiences ongoing sleep disruption.

While Mr. Rombough is currently employed in sales, the evaluator concluded that he remains psychiatrically unable to work in any first responder or law enforcement capacity due to his symptoms.

Treatment Needs and Prognosis

Dr. Bokarius emphasized that Mr. Rombough requires evidence-based PTSD treatment, identifying Trauma-Focused Cognitive Behavioral Therapy as the gold standard. He also recommended psychiatric consultation for medication management, noting that pharmacological treatment is often synergistic with psychotherapy for PTSD.

This report supports that Mr. Rombough suffers from serious mental health conditions—including PTSD, depression, and anxiety disorders—that materially affect his emotional regulation, stress tolerance, sleep, judgment, and functioning. The evaluation further establishes that these psychiatric conditions are not speculative: they are supported by standardized psychological testing and clinician-administered PTSD assessment tools.

Although Dr. Bokarius notes certain conditions pre-dated the triggering traumatic incident, he clearly attributes Mr. Rombough's PTSD primarily to the December 10, 2021 shooting and further recognizes that subsequent investigations and public exposure contributed to additional psychiatric deterioration.

4.    Family Responsibilities and Support

Mr. Rombough is a husband and father in an intact household and has maintained family support.  The PSR reflects he assists his parent with significant medical needs and remains the only child maintaining that relationship. These responsibilities do not excuse the offense, but they are relevant to a tailored sentence and reentry planning.

5.    Collateral Consequences

In addition to incarceration, Mr. Rombough has suffered severe collateral consequences: termination from law enforcement, reputational harm, and forfeiture of a portion of CalPERS benefits. These penalties are not a substitute for incarceration, but they are real, punitive, and relevant to the overall "just punishment" analysis.

6.    The Unique Severity of Incarceration for Former Law Enforcement Officers

Federal courts have long recognized that imprisonment may be substantially more severe for former law enforcement officers than for the average defendant, and that this reality may properly be considered when imposing sentence under 18 U.S.C. § 3553(a).

In *Koon v. United States*, 518 U.S. 81 (1996), the Supreme Court held that a defendant's unusual susceptibility to abuse in prison is a valid sentencing consideration. The Court affirmed a downward departure for police officers based on the heightened risks they faced in custody, recognizing that incarceration may impose qualitatively harsher punishment when a defendant's background exposes them to greater danger and isolation.

Post-*Booker*, courts continue to recognize that sentencing judges may account for the real-world conditions of confinement when those conditions render a term of imprisonment more onerous than contemplated by the Guidelines. See *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008); *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009); *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008). These decisions confirm that personal characteristics and circumstances affecting the severity of confinement may be weighed as part of an individualized sentencing assessment.

Courts have also recognized that cooperation by law enforcement officers against fellow officers carries extraordinary professional, personal, and safety consequences that are qualitatively different from those faced by civilian defendants. Law enforcement agencies are insular, hierarchical institutions, and officers who break the entrenched "code of silence" often suffer permanent ostracism, loss of professional identity, reputational ruin, and heightened risk of retaliation both in custody and after release. See *Koon v. United States*, 518 U.S. 81, 111–12

(1996); *United States v. Volpe*, 78 F. Supp. 2d 76, 92–94 (E.D.N.Y. 1999); *United States v. Doe*, 870 F.2d 654, 657–58 (D.C. Cir. 1989). Courts have held that the degree of risk and sacrifice associated with such cooperation may be considered under 18 U.S.C. § 3553(a), not to excuse criminal conduct or confer special status, but to ensure that punishment remains proportionate where cooperation entails extraordinary and enduring consequences beyond the ordinary incidents of prosecution and imprisonment.

Courts have specifically applied this principle to former law enforcement officers, recognizing that they are often subject to protective custody, administrative segregation, restricted movement, limited programming, and heightened risk of harm, making incarceration substantially more punitive. See *United States v. LaVallee*, 439 F.3d 670 (10th Cir. 2006); *United States v. Volpe*, 78 F. Supp. 2d 76 (E.D.N.Y. 1999); *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001). These courts emphasize that such conditions result in greater psychological and physical hardship than ordinary imprisonment.

Importantly, courts have stressed that consideration of these factors does not excuse criminal conduct or confer special status, but instead ensures that punishment remains proportionate by recognizing when incarceration is functionally more severe for a particular defendant. See *Koon*, 518 U.S. at 111–12.

Accordingly, under § 3553(a), the Court may consider the uniquely harsh nature of confinement faced by former law enforcement officers in determining a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

The Court may also consider the unprecedented impact of the COVID-19 pandemic on law enforcement as part of the individualized assessment required by 18 U.S.C. § 3553(a).

During the pandemic, officers were routinely required to work extended hours under conditions of uncertainty, heightened public tension, reduced staffing, and rapidly changing policies, often without adequate institutional support or decompression resources. Courts have recognized that the pandemic placed extraordinary psychological and operational strain on law enforcement officers, increasing stress, isolation, and burnout, while simultaneously eroding traditional accountability mechanisms and support structures. Although these conditions do not excuse the conduct at issue, they provide important context for understanding how judgment can deteriorate under sustained crisis conditions and why mitigation is appropriate where a defendant has accepted responsibility, demonstrated remorse, and is unlikely to reoffend. Consideration of this context supports a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

The record also reflects that the offenses occurred within a broader breakdown of institutional culture at the Antioch Police Department during the COVID-19 pandemic, when accountability mechanisms weakened and a dangerous form of vigilante-style policing took hold among certain officers. As the pandemic disrupted normal court operations and prosecutions declined, some officers came to perceive that lawful consequences for criminal conduct were absent, fostering an unlawful belief that punishment could be imposed informally through force rather than through the justice system. This cultural deterioration—marked by normalization of excessive force, peer reinforcement, and a corrosive "ends justify the means" mentality—does not excuse Mr. Rombough's conduct, which he has fully acknowledged as wrongful and unconstitutional. It does, however, provide critical context under 18 U.S.C. § 3553(a) for how sustained crisis conditions and institutional failure can distort judgment and amplify misconduct, particularly where a defendant has accepted responsibility, expressed genuine remorse, and taken

concrete steps toward rehabilitation. Consideration of this context supports a variance that reflects individualized culpability while still promoting respect for the law and deterrence.

C.   Character References

The Court has also received letters from individuals who know Mr. Rombough well and who attest to his character (Exhibit D), family commitment, and personal growth. Erin "Nikki" Rombough, Mr. Rombough's sister, describes him as a loyal, hardworking, kind, and generous individual who has played a significant supportive role in her life since childhood. She explains that during a difficult upbringing, Mr. Rombough stepped into a protective brother-and-father figure role, providing stability and guidance when their father did not.

Rombough Character letter

Ms. Rombough further notes that Mr. Rombough is a dedicated father and stepfather whose relationship with his children is central to his life. She explains that he has matured significantly in recent years and has taken meaningful steps to improve himself emotionally and mentally. According to Ms. Rombough, Mr. Rombough's family—including his children and extended relatives—rely heavily on his presence and support, and his continued involvement in their daily lives is deeply important to them.

Rombough Character letter

These letters reflect that Mr. Rombough is viewed by those closest to him as a devoted family member and a person who has demonstrated genuine personal growth, factors that support a sentence that allows him to remain a constructive presence in the lives of his children and family.

The Court has also received a letter from Cassidy Rombough, the defendant's wife, describing Mr. Rombough as a deeply committed husband, father, and provider who consistently demonstrates a strong work ethic and dedication to his family. Mrs. Rombough explains that Mr. Rombough is the "hardest-working person" she knows, someone who approaches every responsibility with determination and effort, whether in his professional work or in providing for his family. She describes him as a devoted father to their three-year-old son and a supportive stepfather to her fifteen-year-old son, emphasizing that he makes extraordinary efforts to be present in their lives, attending activities and creating meaningful experiences for them despite demanding work obligations.

Mrs. Rombough also portrays Mr. Rombough as a person who instinctively helps others, noting that he routinely goes out of his way to assist people in need—whether helping with projects, stopping to aid motorists, or returning lost property. She explains that he places great importance on reliability and accountability and strives to instill those values in his children.

Importantly, Mrs. Rombough describes the profound emotional impact these proceedings have had on Mr. Rombough. She explains that he has been deeply remorseful and has struggled significantly with the consequences of his actions, yet continues to persevere because of his commitment to his children and family. Mrs. Rombough respectfully asks the Court to consider Mr. Rombough's character, his role as a father and husband, and the importance of his presence in the lives of his children when determining an appropriate sentence.

D.    The Need for the Sentence to Reflect the Purposes of Sentencing (§ 3553(a)(2))

1.    Just Punishment

A felony conviction for a former police officer—together with the significant, often unintended consequences that follow—sends a powerful message. It demonstrates that civil rights violations under color of law are grave offenses and will result in substantial accountability.

At the same time, it avoids imposing more incarceration than is necessary to serve this purpose, in light of the defendant's acceptance of responsibility and unique circumstances. This approach recognizes both the seriousness of the offense and the individualized impact of a felony conviction on a former law enforcement officer.

2.    Deterrence (General and Specific)

General deterrence is particularly important in civil rights cases involving law enforcement. Any felony conviction combined with the lasting collateral consequences, supervision conditions, and restitution obligations—provides meaningful deterrence.

Specific deterrence is addressed by the fact that Mr. Rombough is no longer a police officer and will be supervised upon release, with a mental-health treatment condition. His low criminal history and compliance on bond further support a finding that a below-guideline sentence is sufficient to deter future misconduct.

3.    Protection of the Public

Mr. Rombough's offenses occurred in the specific context of his former role as a police officer.  He no longer holds that role, and the requested sentence includes a lengthy term of supervised release. Public protection can be achieved without a higher sentence than necessary.

4.    Rehabilitation and Needed Treatment

The PSR supports outpatient mental-health treatment as a condition of supervision. That treatment—along with stable family support and structured reentry—best advances the rehabilitative purpose of sentencing.

E.    The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6))

The PSR includes JSIN data for similarly situated defendants (Final Offense Level 28; CH I), showing substantial prison sentences are typical in this category. A 65-month sentence, with no other considerations remains a significant prison term and is consistent with national practice while accounting for the specific mitigating factors here. It also aligns with the probation office's variance recommendation.

F.    Restitution and Financial Considerations (§ 3553(a)(7))

Restitution is anticipated and should be ordered as required by statute in an amount to be determined. In light of restitution and the other financial consequences already incurred, Mr. Rombough respectfully requests that the Court waive any fine and focus financial obligations on restitution and the mandatory assessments.

## VI.    COOPERATION / POTENTIAL GOVERNMENT MOTION

The PSR notes the plea agreement contemplates a potential government motion under USSG § 5K1.1 and/or 18 U.S.C. § 3553 (as applicable) if the government determines Mr.

Rombough has provided substantial assistance. If the government files such a motion, Mr. Rombough respectfully asks the Court to give it appropriate weight in selecting a sentence sufficient but not greater than necessary.

## VII.   PROPOSED SENTENCE

Mr. Rombough respectfully requests the Court impose:

1.    Counts One, Six, and Seven, all to run concurrently;

2.    Supervised Release: 3 years, concurrent, with standard conditions and appropriate special conditions including outpatient mental health treatment;

3.    Restitution: as ordered by the Court, amount to be determined;

4.    Fine: waived;

5.    Special Assessment: $100 per count ($300 total);

6.    Voluntary surrender: permitted.

## VIII.  CONCLUSION

This Court's task is to impose a sentence that is just, individualized, and not greater than necessary. Mr. Rombough accepts responsibility for serious wrongdoing and understands that incarceration is warranted. Any felony sentence represents a substantial punishment, promotes respect for the law, provides deterrence, protects the public, and leaves room for rehabilitation

and meaningful reentry. For these reasons, Mr. Rombough respectfully requests that the Court

impose the sentence described above.


Dated: March 13, 2026                          Respectfully submitted,


*Anthony Brass*

/s/ Anthony John Brass
Anthony John Brass
Attorney for Defendant Eric Allen Rombough