# EXHIBIT A

Re: Eric  Rombough
03/11/2024                                                   Page **1** of **33**

# Center for Occupational Health

## Vladimir Bokarius, MD, PhD, QME
### 2970 Hilltop Mall Rd, Suite 101
### Richmond, CA 94806
### 855-779-2763 (P/F)

Eric A. Rombough
1692 Rockville Rd
Fairfield, CA 94534
Cell: (707) 419-0448

Tiffany D. Corona, Esq.
Lenahan, Slater, Pearse, & Majernik, LLP
2542 River Plaza Dr
Sacramento, CA 95833
Fax: (916) 443-0869

**Re**:                       Eric Rombough
**Date of Birth**:            5/31/1979
**Date of Injury**:           4/1/2023
**Employer**:                 City of Antioch
**Claim number**:             WC-2405-AN
**Location**:                 292 Alamo Drive, Suite 3, Vacaville, CA 95688

### PQME PSYCHIATRIC EVALUATION AND REPORT (ML-201)

On **3/11/2024** I conducted a Psychiatric Panel Qualified Medical Evaluation of Mr. Eric Rombough. Mr. Rombough is a 44-year-old, English speaking, Caucasian married male born in Hayward, California, who drove a truck, unaccompanied, to my Vacaville office. The examinee did not use any assistive devices.

The examinee was interviewed at this office and was also administered psychological testing.

This evaluation and report are billed as ML-201 with modifier 96 due to being a comprehensive med-legal evaluation performed by a psychiatrist. No interpreter was required to complete this evaluation.

Re: Eric  Rombough
03/11/2024                                                                           Page **2** of **33**

Before the examination began, the PQME selection process was explained to the examinee. The examinee was informed of being evaluated exclusively in connection with the Workers' Compensation claim. The examinee was also made aware that any communication between us is not privileged (doctor-examinee confidentiality) and that any information provided, as well as the results of the psychological testing and my conclusions regarding the case would be included in a report that may be read by people involved in the resolution and/or litigation of the claim. The examinee was also advised that he may take a break or stop the evaluation at any time for good cause. The examinee understood the aforementioned and agreed to proceed with the evaluation.

## HISTORY OF INJURY AS PRESENTED BY THE EXAMINEE:

Mr. Rombough was employed by the City of Antioch as a police officer from 2018 through 2023. At the time of the 12/10/2021 incident, Mr. Rombough was employed as SWAT officer and performed the following functions: responding to high-risk search and arrest warrants, including incidents involving barricaded suspects, active shooters, and hostage rescues, as well as any other situations requiring resources beyond the capacity of the patrol division.
Mr. Rombough reports that while performing his regular and customary duties he sustained an industrial injury.
The examinee describes the following mechanism of the injury:

Though he witnessed multiple traumatic events during his employment with the City of Antioch, Mr. Rombough singles out a 12/10/2021 SWAT call during which he and multiple other officers were involved in a shooting that resulted in a fatality. Mr. Rombough reports that he and other officers responded to a scene in which a suspect had lit his own home on fire and was attempting to run toward other residences while firing approximately 70 rounds of ammunition at the responding officers. Mr. Rombough describes the incident, stating, "Our comms didn't work. He probably fired 60, 70, 80 times. I unloaded my rifle, switched to my pistol, and unloaded until he stopped making any noise." Mr. Rombough admits that this was the first time that he had used lethal force and clarifies that four officers in total shot the suspect, all reportedly hitting their mark. Mr. Rombough reports that was not allowed to debrief and was placed on administrative leave for 2 weeks following the shooting. Upon returning to work, Mr. Rombough had to complete a drill that reminded him of the shooting in which he was directed to fire his rifle until the magazine was empty and then switch to his sidearm. He resigned from the SWAT team following this drill and returned to being a patrol officer. Mr. Rombough states, "You always think you're going to have to take someone's life if you're policing, especially if you're in a dangerous area. This was the straw that broke the camel's back."

He reports that the above injury caused significant distress that transformed into psychiatric symptoms. Chief complaints included: anxiety and posttraumatic spectrum symptoms including nightmares and intrusive thoughts.

## HISTORY OF PRESENT ILLNESS:

The examinee states that the psychiatric symptoms began around the time of his transferring to Antioch. He mentions two suicide calls that he responded to while working as a deputy sheriff that had caused him to develop psychiatric symptoms prior to the 12/10/2021 shooting incident, though he clarifies that he did not seek treatment for these symptoms, which he describes as "bad memories," until he "switched to Antioch and saw how bad things were." Mr. Rombough admits that he experienced depression prior to his transferring to Antioch, which he attributes to relationship issues and his 2010 divorce. He admits that he experienced depression in this regard until re-marrying in 2020, after which the depression "got lighter" but "was still there." Mr. Rombough sought treatment through the Employee Assistance Program (EAP) and attended group therapy "on and off." He specifies that he did not receive individual psychotherapy or develop anxiety until just prior to the 12/10/2021 shooting.

Mr. Rombough reports that he would occasionally take a sick day – "maybe once or twice a month" – prior to the 12/10/2021 shooting, as he felt "unable to do [his] job" due to a "lack of focus." He notes that this lack of focus was likely attributable to sleep problems, which he began experiencing as early as 2013, around the time that he began working graveyard shifts. The provided records detail a motor vehicle accident that occurred when the examinee fell asleep at the wheel (9/26/2015, S Prince, MD, ER report), which the examinee confirms and attributes to his working graveyard shifts.

Mr. Rombough reports that he began to experience anxiety "a couple of days" before the 2021 shooting, when he was notified that his wife was pregnant and that there could be complications with the pregnancy. He states, "It puts a whole lot of other things in priority when you go through things like that (i.e., being a father vs. a dangerous career). Following the shooting, Mr. Rombough reports that he developed posttraumatic symptoms – specifically hypervigilance (in public places where he had felt previously comfortable), nightmares, intrusive thoughts, and irritability. Mr. Rombough began receiving psychotherapy from Ken Walter, LMFT as early as April of 2022, before changing providers around February of 2023 to Joshua Skinner, LMFT, who documented posttraumatic symptoms including intrusive thoughts, frequent nightmares, and dissociative flashbacks (2/18/2023, J Skinner, LMFT, Psychotherapy note).

Per the provided records, Mr. Rombough was placed on administrative leave as early as April of 2022, during which time he experienced "feelings of relief from not having to service in the capacity of a peace officer" (4/29/2022, K Walter, LMFT). During the evaluation, Mr. Rombough reports that he was placed on administrative leave in May of 2023, though he does not dispute that the leave may have begun earlier. The provided records also indicate that Mr. Rombough was frustrated regarding the behavior of the administration and being placed under investigation, though he admits that this frustration subsided somewhat, as he came to understand that the chief "was just trying to keep his job." In mid-2023, several articles were included in national publications, detailing police brutality perpetrated by Mr. Rombough and several others, which eventually led to his resigning from the police force in September of 2023. The provided records include an investigation report by the Contra Costa District Attorney's Office dated 3/27/2023, which reveals that members of said office and the FBI found text

communications between sworn law enforcement members of the Antioch Police Department that they believed to have violated the Racial Justice Act, including derogatory, homophobic, and sexually explicit language and photographs that demonstrate racial bias and animus toward African Americans and other people of color. Another note from Joshua Skinner, LMFT details Mr. Rombough's feeling overwhelmed and experiencing suicidal ideation after Mercury News published several text messages that he had exchanged with other officers. Joshua Skinner also notes that Mr. Rombough "never felt a greater anxiety about being taken into custody" (4/13/2023, J Skinner, LMFT, Psychotherapy note). Joshua Skinner's subsequent psychotherapy notes detail Mr. Rombough's experiencing additional stress due to the media's releasing he and his wife's personal information, which resulted in a deluge of phone calls and social media comments from other members of the media and strangers (4/18/2023, J Skinner, LMFT Psychotherapy note; 5/2/2023, J Skinner, LMFT, Psychotherapy note).

Mr. Rombough reports that Joshua Skinner, LMFT committed suicide in February of 2024 and that he has since resumed treatment with Ken Walter, LMFT, which he is paying for out-of-pocket. He denies receiving psychopharmacological treatment, though he admits to using 3-to-4 alcoholic beverages (vodka mixed with Sprite) on Fridays and Saturdays to help mitigate anxiety and to assist with sleep.

## CURRENT REPORTED SYMPTOMS:

From a psychiatric standpoint, the claimant now reports anxiety, depression, and insomnia. He presents with the following symptoms:
depressed mood, anhedonia, middle insomnia, decreased attention and concentration, forgetfulness, disturbance of appetite, weight gain, decreased self-esteem, decreased energy level, anger, anxiety with somatic symptoms, PTSD spectrum symptoms including episodic nightmares, irritability, intrusive thoughts of past traumatic events, and avoidance behavior. The examinee denies current suicidal ideation, but admits to having considered possible methods of suicide without a concrete plan.

Mr. Rombough reports that depression is currently his most prevalent symptom, admitting that he experiences depression "more times than not." He describes experiencing anhedonia regarding several activities that he previously enjoyed (e.g., CrossFit, attending his stepson's baseball practices, going for drives), though he does not specify if his loss of interest in these activities is due to depression or the media's revealing his personal information. He mentions that his best friend moved to Alabama and that he would like to leave California in the future. Mr. Rombough admits that he thinks about suicide on a weekly basis, "to end everything, be done with it." He admits that he "got rid" of his firearms when he realized that suicide was a real possibility. Mr. Rombough clarifies that he is not currently suicidal and that he has never had a concrete plan to kill himself. He states, "I could take pills if I really wanted to. I have a bottle full. I just go off and take a hike and leave my phone and no one would ever know." He then denies his willingness to go through with suicide, stating, "I think about it but I'm not that selfish that I'm going to do that to my kids and my wife."

Mr. Rombough reports that he experiences anxiety about half the time and that he feels more anxious when in public. He attributes his experiencing increased anxiety in public to hypervigilance, specifically around crowds, and notes that he no longer attends events (e.g., concerts, sports games) that might require being around a large group of people. As previously mentioned, Mr. Rombough admits to drinking alcohol to help cope with anxiety but specifies that he only does so on Fridays and Saturdays, yet he admits that he fears becoming an alcoholic.

Mr. Rombough reports that he experiences intrusive thoughts of the 2021 shooting incident "a couple of times per week," which last 15-to-30 minutes and require him to stop what he is doing. He states, "Sometimes I'll see it coming on and I'll tell whoever I'm talking to that I need to go for a little walk or make a phone call." Mr. Rombough admits to exhibiting avoidance behavior, specifying that he will often travel different routes to avoid passing reminders of his previous employment with law enforcement. Mr. Rombough also reports that he experiences flashbacks, though his description of said flashbacks reveals that he is actually describing nightmares. He admits that these "flashbacks" do not occur during the day, rather they only occur when he is sleeping.

Mr. Rombough continues to struggle with sleep. He reports that he goes to bed between 8:00 and 8:30 PM and is able to fall asleep fairly easily. He then wakes up between 1:00 and 1:30 AM and cannot fall back asleep. Mr. Rombough reports that he experiences nightmares once or twice per month and that he now sleeps in the living room to avoid waking up his wife when he experiences one.

Though he displayed adequate concentration during the course of this evaluation, Mr. Rombough reports that he experiences decreased concentration. He mentions that he cannot find his wallet "most of the time" and that he now has to write down reminders to avoid forgetting details or dates. He admits that he struggles with concentration even when he achieves 6-hours of sleep, stating, "I don't feel like my mind ever gets a break. I don't feel refreshed." Mr. Rombough drinks a 16oz Rockstar energy drink every day around 1:00 PM, which is generally when he notices that he is feeling tired.

Mr. Rombough reports that he is "25-to-30%" less angry now, with the peak of his anger occurring in the immediate aftermath of the shooting when he was not allowed to debrief "because [the interim chief] knew that he had made a mistake."

Mr. Rombough states that from a physical standpoint, he currently experiences back pain centered between his shoulder blades, dizziness, and diarrhea for which he takes Imodium. Mr. Rombough also mentions that he experiences stomach pain "every morning" that lasts for "an hour or so" and that his wife fears that he may have an ulcer or cancer. He has not sought treatment for this stomach pain.

**Functional Impairment** The symptoms described above affect the claimant's functioning as follows:

Mr. Rombough reports that he currently works as a salesman, selling construction supplies like rebar. He admits that resigning from law enforcement has been beneficial for his mental health, stating, "I don't have to worry about anyone shooting at me. They only know me as a

salesperson, they don't see me as a uniform hopping out of a car." Despite experiencing some relief in regard to work stressors, Mr. Rombough admits that he "still [has] a hard time forcing [himself] to go to work." He states, "I just don't have the drive I had before." Similarly, Mr. Rombough admits that he has lost interest in several of the activities that he previously enjoyed, many of which were physical, which has resulted in his gaining weight. Mr. Rombough does not attribute his loss of interest in working out (CrossFit) to any specific factor but notes that his loss of interest in other, more social activities is due to his hypervigilance and feeling uncomfortable in crowds. Mr. Rombough admits that poor sleep and concentration have led to his having to use navigation to commute to work. Likewise, Mr. Rombough admits that struggling to follow instructions when performing maintenance tasks, which he describes as "something not firing right in [his] brain." Prior to the 12/10/2021 shooting, Mr. Rombough was working fulltime as a SWAT officer, responding to various emergency scenes. He reports that he took pride in his job and ensured that he maintained his physical shape so that he could work effectively. Mr. Rombough previously enjoyed attending his stepson's baseball practices and games, as well as attending other public events like concerts. Following the shooting incident of 2021, Mr. Rombough now works as a salesman. He admits that he does not exercise as frequently, which has caused him to gain weight. He no longer attends public events, as he fears crowds. Mr. Rombough mentions that he enjoys audiobooks, though he admits that he often loses focus while listening to them and must replay certain chapters.

Regarding his career with law enforcement, Mr. Rombough reports that he would have continued working as a patrol officer if not for his being investigated for police brutality. Additionally, he notes the possibility of his being sentenced to federal prison and admits that "it's hard to tell where the line is that delineates" whether his current psychiatric symptoms are attributable to the 12/10/2021 shooting or the possibility of his going to prison.

In order to specify the impairment in activities of daily living, the examinee was asked to complete the following questionnaire. Each answer was clarified by the evaluator.

**Activities of Daily Living**
The response scores are based on psychiatric impairment only.
Response scores are defined as:
0 – no impairment, 1- mild, 2 – moderate, 3 – marked, 4 – severe, 5 – not applicable

**1. Eating** – 1, the examinee indicates that he experiences a disturbance in appetite, often going without eating for extended periods and then binge eating later.
**2. Dressing** – 1, the examinee indicates that he continues to dress independently but does not care what he wears. He clarifies that he will not wear dirty clothes, rather he does not care if his outfit matches or looks nice.
**3. Personal hygiene** – 1, the examinee indicates that he does not always care about his hygiene. He mentions that he will sometimes skip bathing and brushing his teeth.
**4. Taking medicine** – 5, the examinee indicates that he does not currently take medications.
**5. Personal appearance** – 1, the examinee endorsed 4; however, he admits that he still cares about his appearance when going out in public but does not care at home.

Re: Eric Rombough

03/11/2024

**6. Cooking** – 1, the examinee indicates that he continues to cook but no longer enjoys it.

**7. Setting the table** – 5, the examinee indicates that he has never been responsible for setting the table.

**8. Housekeeping (cleaning)** – 0, the examinee indicates that he keeps house as usual.

**9. Home/garden maintenance** – 2, the examinee endorsed 4; however, he admits that he no longer cares about home/garden maintenance tasks but will occasionally complete small tasks at the urging of his wife, rather than his previous indication that he no longer completes home/garden maintenance tasks.

**10. Laundry** – 0, the examinee indicates that he does laundry as usual.

**11. Employment** – 1, the examinee indicates that he continues to work but must spend more time and effort on the same tasks and becomes more tired than before due to mental problems.

**12. Recreation** – 3, the examinee indicates that he no longer cares about recreational activities but will engage with encouragement.

**13. Organizations/clubs/church** – 4, the examinee indicates that he no longer cares about meetings/events and has stopped attending them.

**14. Leaving home** – 1, the examinee indicates that he does not like to leave the house as often as before.

**15. Food shopping** – 3, the examinee indicates that he no longer enjoys food shopping and does not do it unless accompanied by someone else.

**16. Handling money** – 0, the examinee endorsed 4; however, he admits that he has no problem handling money, rather than his previous indication that he no longer handles money.

**17. Managing finances** – 2, the examinee endorsed 3; however, he admits that he forgets to pay bills and has trouble balancing his checkbook, rather than his previous indication that he requires assistance with financial activities. The examinee clarifies that he is capable of managing his finances but no longer cares to do so.

**18. Public transportation** – 5, the examinee indicates that he does not need to use public transportation and never uses it.

**19. Driving** – 1, the examinee indicates that his current mental health impairs his driving and that he now drives more cautiously than before.

**20. Travel outside familiar environment** – 2, the examinee indicates that he frequently becomes disoriented but is able to travel with navigation.

**21. Using the phone/internet/social media** – 1, the examinee indicates that he communicates less frequently than before.

**22. Talking** – 2, the examinee indicates that he avoids talking to people other than friends and family.

**23. Understanding** – 1, the examinee endorsed 3; however, he admits that he has to strain more than usual to understand, rather than his previous indication that he frequently requires repetition of statements.

**24. Reading** – 2, the examinee indicates that he has trouble understanding or remembering what he reads.

**25. Writing** – 1, the examinee indicates that he writes less often than before.

## PAST PSYCHIATRIC HISTORY:

Mr. Rombough suffered from insomnia since he began a career in law enforcement and worked
night shifts. The earliest Kaiser record available for review is from 2013 and reflects sleep
impairment. He was involved in an MVA due to falling asleep behind the wheel and had periods
of missing work shifts due to daytime impairment in functioning due to insomnia.
Claimant admits to a history of depression, dating back as far as 2010, in conjunction with his
divorce. Depression lasted through 2020, when he remarried. He denies ever having received
psychopharmacological treatment, but sought counseling through EAP since 2018.

Mr. Rombough mentions two suicides that he responded to in 2014, prior to his working in
Antioch, that he still thinks about. He describes the first suicide, stating, "First one that really
sticks in my mind, there was a younger, I think a teenage guy, he was eating lunch, his parents
had just picked him up Chipotle and he decided to kill himself with a gun." He mentions that he
was new to being a patrol officer at the time and was tasked with securing the scene. Mr.
Rombough continues, stating, "Before the coroner showed up, the older brother came, and I
had to tackle him to stop him from entering the crime scene." He notes that having to tackle
the brother bothered him more than actually seeing the crime scene. Mr. Rombough reports
that the second suicide involved an elderly gentleman who lived alone with his dog. He
explains, "We got a call for shots fired and he put a bullet in his head. At the time, I had recently
been divorced, so I sort of put myself in his shoes."

## SUBSTANCE USE HISTORY:

The examinee admits to having used the following substances:

Alcohol – the examinee indicates that he drinks 2 alcoholic beverages per week on his intake
questionnaire. During the evaluation, the examinee admits that he actually drinks 3-to-4 drinks
on Fridays and Saturdays, and sometimes more. He has consumed alcohol since 2000.
Caffeine – the examinee reports that he has drank 14 caffeinated beverages per week since
1993. He mentions during the interview that he drinks the "normal size" can of Rockstar Energy
Drink, which is 16 oz and contains 160 mg or more of caffeine depending on the flavor.

The examinee denies ever having experienced a time in his life in which he felt unable to
control his use of the above substances. Likewise, he denies ever having received substance
abuse counseling.

## MEDICAL HISTORY:

The examinee reports that prior to the industrial injury he had the following medical problems:
Erectile dysfunction (2014), Herpes simplex (2015), Wrist fracture (2015), R shoulder pain
(2015), Dizziness

Since the injury, examinee has developed the following conditions:
Weight gain (2021), Back pain, Stomach pain, Diarrhea

**SURGERIES:**
The examinee states that he has had the following surgeries:
Left leg fracture – approximately 1998

**CURRENT MEDICATIONS:**
Imodium

**ALLERGIES:** The examinee reports an allergic reaction to Aleve.

**ENVIRONMENTAL AND DEVELOPMENTAL HISTORY:**

**PERSONAL AND FAMILY HISTORY**: The examinee was born in Hayward, California. He was raised by his mother and father, as well as his grandparents along with his 2 sisters. The examinee reports that he maintains a close relationship with his parents and sisters. He describes his childhood as happy and relationship with parents as warm and caring.

**EDUCATIONAL HISTORY**: The examinee completed 14 years of education and earned as associate degree. He obtained average grades and did not have any significant discipline problems. The examinee indicates that, for the most part, he established good interpersonal relationships with other students and teachers.

**MARITAL HISTORY:** The examinee is married. He has a 19-month-old son from his current marriage and a 13-year-old stepson. The examinee was in a previous marriage from 2000 until undergoing divorce in 2010. He admits that being placed under investigation for police brutality and the subsequent media coverage of his actions have placed strain on his marriage, though he feels that his wife has been supportive.

**MILITARY HISTORY**: The examinee denies military history.

**EMPLOYMENT HISTORY:** Mr. Rombough states that he has had various jobs throughout his life, including the following:
ES Construction/SMR Designs/DGR Construction – the examinee worked as a laborer initially before eventually becoming a partner from 1997 until around 2005, when he changed his profession.
ACSO – the examinee worked as a deputy officer from around 2012 until 2018.
City of Antioch – the examinee worked as an officer from 2018 until 2023, when he resigned following his being placed under investigation for police brutality.

Re: Eric Rombough
03/11/2024

The examinee currently works as a construction supplies salesman. He reports that he did not experience stress regarding his finances during the almost 2 years of administrative leave that he underwent, due to having savings.

**FAMILY HISTORY OF**:
**Mental illness**: Denies
**Medical illness**: Denies
**Drug/alcohol use**: Denies

**LEGAL HISTORY**:
The examinee admits to having been arrested at age 44 for "use of force." He was not convicted and did not serve time in jail. He reports that he was sued by an arrestee in 2023 and that the case is ongoing.

Mr. Rombough also reports that he was sued by a subcontractor in the 2000's and settled for $1,000.

**REVIEW OF PRIOR RECORDS:**

A total of 282 pages of records were received and reviewed by me in conjunction with this evaluation. A summary of the records reviewed is provided at the end of this report as Attachment A for the convenience of the reader.

**MENTAL STATUS EXAMINATION:**

**ID**: The claimant is a 44-year-old male
**Appearance**: overweight, average height, adequately groomed, appropriately dressed, looking stated age
**Demeanor**: cooperative, polite, open
**Reliability**: fair historian, provided an inaccurate timeline regarding the beginning of his administrative leave
**Eye Contact**: good
**Speech**: **Rate**: normal. **Volume**: normal. **Articulation**: normal. **Quality**: normal
**Motor Activity**: no psychomotor agitation/retardation, no abnormal involuntary movements/posture/gait
**Mood**: depressed, anxious, angry
**Affect**: **Range**: full. **Motility**: fluid. **Quality**: average, incongruent to described mood
**Thought Process**: logical, goal directed
**Thought Content**: no delusions, no paranoid ideation, intrusive thoughts of past traumatic events and perceived mistreatment by administration
**Dangerousness**: episodic suicidal ideation without a plan or intent, no homicidal ideation, no self-injurious thoughts
**Perceptual Disturbance**: denies, does not appear to respond to internal stimuli

Re: Eric  Rombough
03/11/2024                                                    Page **11** of **33**

**Alertness**: alert
**Orientation**: oriented to self, place, time, and situation
**Attention/Concentration**: good, follows the line of the interview without difficulties, completed required paperwork faster than the average examinee
**Memory**: grossly intact
**Fund of General Knowledge**: average, appropriate to the sociocultural and educational background
**Judgment**: impaired
**Insight**: impaired

**<u>PSYCHOLOGICAL TESTING:</u>**

Level 1 Cross Cutting Symptom Measure, along with referral information was used to initially determine what additional testing may be necessary to assess severity of symptoms. The need for additional testing was further clarified during the clinical interview.

**Level 1 Cross Cutting Symptom Measure**
The DSM-5 Level 1 Cross-Cutting Symptoms Measure- Adult is a patient or informant-rated measure designed to assess mental health across multiple domains of pathology. It contains questions corresponding to 13 psychiatric domains: depression, anger, mania, anxiety, somatic symptoms, suicidal ideation, psychosis, sleep problems, memory, repetitive thoughts and behaviors, dissociation, personality functioning, and substance use. The measure is designed to aid clinicians in identifying areas of inquiry corresponding to the patient's underlying mental health diagnosis, treatment, and prognosis. The measure may be used to track a patient's progress over time. Each item is rated on a 5-point scale ranging from 0 (none or not at all) to 4 (severe or nearly every day). Ratings that exceed threshold for a particular domain may serve as a guide for additional inquiry into domain-specific symptomology.

The examinee's scores on the level 1 assessment suggest a need for further testing using the following measures:

| | | | | | |
|---|---|---|---|---|---|
| ☒ | Level 2 Anger | 15 min | ☐ | Severity Measure for Specific Phobia | 15 min |
| ☐ | Level 2 Repetitive Thoughts and Behaviors | 15 min | ☒ | Quick Inventory of Depressive Symptomatology | 15 min |
| ☒ | Level 2 Sleep Disturbance | 15 min | ☐ | P3 – Pain Patient Profile | 60 min |
| ☒ | Level 2 Somatic Symptom | 15 min | ☒ | SCL-90R- Symptom Checklist | 60 min |
| ☐ | Severity Measure for Agoraphobia | 15 min | ☒ | Epworth Sleepiness Scale | 15 min |

Re: Eric  Rombough
03/11/2024                                                                          Page **12** of **33**

| | | | | | |
|---|---|---|---|---|---|
| ☒ | Severity Measure for Generalized Anxiety Disorder | 15 min | ☐ | ASEX – Arizona Sexual Experience Scale | 15 min |
| ☐ | Severity Measure for Panic Disorder | 15 min | ☒ | PCL-5 – PTSD Checklist | 30 min |
| ☐ | Severity Measure for Social Anxiety Disorder | 15 min | ☒ | CAPS 5 – Clinician Administered PTSD Scale | 60 min |
| | | | | Total time | 4 hours excluding level 1 measure |

Each of the DSM-5 Level 2 cross-cutting symptom measures, QIDS, Epworth are rated by both examinee and clinician. Both scores will be calculated. However, the clinician rated scores will be used to determine severity. SCL-90R, P3, PCL 5, ASEX, and Personality Inventory for DSM 5 instruments are examinee rated only, while the CAPS 5 is a clinician administered semi-structured interview.

Results and interpretation of psychological testing measures is provided as Attachment B to this report for the convenience of the reader.

**DIAGNOSES:**

296.22 (F32.1) Major Depressive Disorder, Single Episode, Moderate (Pre-existing since 2010)
309.81 (F43.10) Posttraumatic Stress Disorder caused by the 12/10/2021 shooting
309.24 (F43.22) Adjustment Disorder with Anxiety (caused by administrative, media exposure, federal investigation and prospect of incarceration)
780.52 (G47.00) Insomnia Disorder (Since beginning shift work in law enforcement)
305.00 (F10.10) Alcohol Use Disorder, Mild
V62.4 (Z60.5) Target of (Perceived) Adverse Discrimination or Persecution in regard to department's response to shooting incident.

**CURRENT GLOBAL ASSESSMENT OF FUNCTIONING (GAF):**  51

**CONCLUSIONS:**

The examinee is a 44-year-old Caucasian married male examined at my office for a Psychiatric Panel Qualified Medical Evaluation in conjunction with his reported industrial injury of 4/1/2023. It is this evaluator's professional opinion, based on the examination of the applicant, review of available records and professional experience in the field of psychiatry, that Mr. Rombough's psychiatric condition is affected by multiple injuries occurring in the course of and subsequent to employment with the City of Antioch. When asked about the injury in the course

of this evaluation, the claimant defaulted to a narrative of the 12/10/2021 shooting and its aftermath. He developed posttraumatic symptoms in response to this incident, when he used deadly force and killed a person for the first time in his life. This occurred in the line of duty and resulted in psychiatric injury. Shortly after this incident, Mr. Rombough was placed on administrative leave and investigated, which provoked anger and anxiety. He chose to leave SWAT and go on patrol duty in an effort to minimize exposure to high risk incidents. He was once again placed on administrative leave in March of 2022 due to an ongoing FBI investigation. This leave and the subsequent release of investigation related information leaking to the media, caused Mr. Rombough to develop Adjustment Disorder with Anxiety. This condition was further aggravated by the possibility of incarceration.

Mr. Rombough has a non industrial diagnosis of Major Depressive Disorder, which pre-dated his employment with the City of Antioch. Similarly, Insomnia disorder stemmed from his prior law enforcement employment and pre-existed employment with City of Antioch.

I have been provided with a redacted medical records file, which contains excerpts of records from Kaiser and Public Safety Family Counseling group. The available records partially support my findings in the course of this evaluation. For example, on 2/18/2023, J Skinner, LMFT diagnosed claimant with PTSD. There is a Diagnosis and Treatment Plan note that appears to be disconnected from the assessment report conducted to arrive at the diagnosis. The support for the diagnosis lists DSM IV criteria for PTSD, but there is no information in the provided records that connects the applicant's experience with noted criteria. There is no information on severity or frequency of symptoms that translate into the noted criteria for the diagnosis of PTSD.
It would be beneficial to compare applicant's presenting symptoms at the time of J Skinner's evaluation and other mental health professionals, with those presented during this evaluation. It would also be beneficial to have access to complete mental health file to better understand the details of treatment rendered thus far and benefits attained from such treatment. Because of the redacted medical records files, I am uncertain if there are evidence based treatment modalities that were attempted and failed in regard to treatment of PTSD.

## ASSESSMENT OF DISABILITY:

Psychiatric impairment will be evaluated with the **Global Assessment of Function (GAF)** since the job related injury was sustained <u>after January 1, 2005</u>. The resultant GAF score is then converted to a **Whole Person Impairment rating (WPI)** using the GAF conversion table set out in the **<u>Schedule For Rating Permanent Disabilities</u>** under the provisions of the Labor Code of the State of California, January 2005.

GAF is a numeric scale (0 through 100) used by mental health clinicians to determine patient's level of functioning in three major areas: social, occupational, and psychological functioning of adults.

91 - 100 No symptoms. Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities.

81 - 90 Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members).

71 - 80 If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).

61 - 70 Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

51 - 60 Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

41 - 50 Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

31 - 40 Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

21 - 30 Behavior is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)

11 - 20 Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute).

1 - 10 Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death.


The examinee's current GAF score is 51 ; however, examinee cannot be considered permanent and stationary as she has not achieved maximum medical improvement. Rating of permanent disability is not applicable at this time.


**<u>WORK STATUS:</u>**

In my professional opinion, the examinee has been psychiatrically temporarily totally disabled in regard to his usual and customary employment since the 12/10/2021 shooting incident. Mr. Rombough reports, and I have no documentation stating otherwise, that he did not have an opportunity to debrief following the shooting incident. His decision to leave SWAT after the incident points to a self imposed work accommodations he made for himself; however, it is reasonably probable that PTSD symptoms, including irritability, anger, aggression, anxiety, fear, impaired concentration, mistrust, feeling cut off from others, heightened startle response – have collectively impaired his ability to carry out his duties in as a patrol officer. It would have been prudent for him to report the injury and seek treatment in the immediate aftermath of the shooting.

Regarding the present work status, the claimant continues to be precluded from work in any first responder capacity due to psychiatric impairment.

Claimant is presently working in a capacity that accommodates his restrictions.

**CAUSATION:**

Mr. Rombough's psychiatric condition is comprised of multiple diagnoses of different origins. I do not find that there was an industrial psychiatric injury predominantly caused by events of employment on 4/3/2023; however, I do find that posttraumatic stress disorder was predominantly (greater than 51%) and directly caused by the shooting incident on 12/10/2021. The description of the applicant's history, reported incident, applicant's presenting symptoms, and course of illness support this opinion.

**APPORTIONMENT:**

There are clear grounds for apportionment in this case, including pre-existing depression and insomnia, and anxiety related to litigation. The applicant has not achieved maximum medical improvement with regard to PTSD and is therefore not permanent and stationary. Apportionment analysis is premature.

**FUTURE TREATMENT RECOMMENDATIONS:**

Mr. Rombough is in need of evidence-based treatment for PTSD. The gold standard for treatment is Trauma Focused Cognitive Behavioral Psychotherapy, which should be provided by a doctoral level psychologist, familiar with treatment of posttraumatic stress disorder in injured workers.

Psychopharmacological treatment is known to be synergistic with psychotherapy for treatment of posttraumatic stress disorder. Therefore, a consultation with a psychiatrist is recommended.

**DISCLOSURE:**

Re: Eric  Rombough
03/11/2024                                                             Page **16** of **33**

It is declared under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information, which, it has been indicated I have received from others. As to that information, it is declared under penalty of perjury that the information accurately describes the information provided to me, and except as noted herein, that this information is believed to be true.

An employee of my office was present during the evaluation and fulfilled the duty of a scribe, capturing a transcript of the interview, which was later used by me for the preparation of this report.

The instructions for psychological testing are included on the tests themselves. Psychological test scoring and interpretation was performed by Vladimir Bokarius, MD, PhD, QME. Examination was performed entirely by the undersigned including obtaining examinee's present psychiatric history, psychiatric complaints, medical history, past psychiatric history, past family history, social history as well as history of the injury and present illness. Also, Vladimir Bokarius, MD, PhD, QME reviewed the available medical records and was responsible for reaching all conclusions expressed in this report.

The time spent in performing this evaluation was in compliance with Labor Code Section 139.2.

It is further declared under penalty of perjury that I have not violated the provisions of California Labor Code Section 139.3 with regard to the evaluation of this examinee or the preparation of this report.

I verify, under penalty of perjury, that I have reviewed 282 pages of records in conjunction with this evaluation and report. The first 200 pages are included with the ML-201 procedure code and additional 82 pages are billed with code ML-PRR.

Additionally, 4.00 hours were spent on psychological testing administration, scoring and interpretation, billed separately as CPT 96136 and 96137.

Signed on 4/9/2024 the County of *Contra Costa*, California.

Respectfully submitted,

_____
**Vladimir Bokarius, MD, PhD, QME**
**Diplomate of the American Board of Psychiatry and Neurology**

**Attachment A**

**Summary of Reviewed Records**

10/23/2013, L Gahrahmat, MD, Progress note, Eric Allen Rombough is a 34 Y male who is here for physical. He is separating from his wife and wants to do STD testing. Works at night for 12 hours a day and sleeps about 4 hours but catches up during the weekend. Is exercising routinely and has lost over 50 lbs. Denies any depression or anxiety. No Active Ambulatory Problems. BP 122/68 | Pulse 55. Wt 164 lb. BMI 22. MSE - normal. Dx: STD Screening. Plan: labs

6/23/2014, N Chang, MD, Progress note, "Pt with ED recently in last 6 mo, works in sheriff dept but thinks stress level is not that high. Divorced now. No DM. No sig wt changes. Tried stopping etoh and did not seem to make any diff. Would like to try medication tx, has not tried any. R shoulder painful with elevation for 6 mo, happened at work, able to raise arm but some pain at extreme elevation. Had altercation at work once and it flared up R shoulder pain". BP 125/70 | Pulse 66. Dx: Erectile Dysfunction. Plan: start Viagra, check testosterone, refer to Work Comp for shoulder sms

3/27/2015, W Hou, MD, Progress note, Patient presents with recurrent cold sore. Dx: Herpes Simplex. Plan: Zovirax

9/26/2015, S Prince, MD, ER report, 36 Y male who was in a motor vehicle accident at about 3:30am this morning after he fell asleep at the wheel. He hit a truck and his car was totaled. He was the driver and was wearing his seat belt. Patient denies loss of consciousness, head injury, headaches, loss of balance, chest or abdominal pain. Has pain at the right shoulder and at the right wrist. BP 130/65 mmHg | Pulse 67. Dx: Nondisplaced Fx distal radius. Plan: Long arm cast applied

9/26/2015, Kaiser, X-ray R wrist, Interarticular distal radial fracture

10/7/2015, Kaiser, X-ray R wrist, Interval cast/splint placement. Stable bone alignment

10/7/2015, M Jones, PA, Orthopedic note, "36 Y male, here for eval of Right, radial styloid IA fracture. Initial Xray +. Tx with LAC now day 9. Today reports minimal pain not requiring pain meds Works for sheriff department and wants to get back ASAP". Plan: Continue LAC for another 7 days

10/28/2015, Kaiser, X-ray R wrist, Healing fracture

10/28/2015, M Jones, PA, Orthopedic note, 36 Y male w/ fracture, Right, radial styloid IA fracture. 4.5 weeks out. Plan: Cock up wrist splint provided today

11/6/2017, H Goli, MD, Progress note, Patient is here today requesting labs for infertility. He is planning to have children with his girlfriend. Hx of miscarriages in his partner per patient. No problems with libido and erection, not taking any medication. His partner is seeking treatment for IVF. Plan: labs

4/29/2022, K Walter, LMFT, Psychotherapy note, Client reported that he is on administrative leave from his employer and shared his feelings of relief from not having to service in the capacity of a peace officer. Client shared he has been feeling a lot of anger about how he was treated by his employer as a result of being involved in a deadly force incident. Client shared that his angry feelings and anxiety have negatively affected his sleep and appetite.

5/12/2022, K Walter, LMFT, Psychotherapy note, Client reviewed his Modified Genogram and identified how his childhood may have affected how he processes his thoughts and emotions. Client shared that he still experiences angry feelings and anxiety when thinking about his employer and/or driving towards the city where he worked

5/18/2022, K Walter, LMFT, Psychotherapy note, Client expressed a strong sense of self-awareness about his thoughts and feelings related to his work experience and how to compartmentalize when he is home with his family

5/27/2022, K Walter, LMFT, Psychotherapy note, Client reported feeling less angry about all that is happening with his department. Client shared he did not sleep well last night, but believes his wife's due date being near and the stress related to caring for his wife and the newborn held some influence

6/3/2022, K Walter, LMFT, Psychotherapy note, Therapist and client explored client's thoughts and feelings about the potential life-transition of leaving law enforcement

6/10/2022, K Walter, LMFT, Psychotherapy note, Client described his feelings of grief, disappointment and anger towards his employer. Client shared he felt unappreciated and devalued by his employer and that all his efforts as a peace officer where for nothing

6/23/2022, K Walter, LMFT, Psychotherapy note, Client reported that his worry often turns to anger as he reflects on the process he is enduring with his department.

7/4/2022, K Walter, LMFT, Psychotherapy note, "Client shared that he has still been experiencing feelings of anger. Client was noted to demonstrate good insight into the problematic nature of his behavior and symptoms. Client reported he has been limiting the time he experiences anger and other negative feelings to 30 minutes and continues with his daily routine"

2/18/2023, J Skinner, LMFT, Diagnosis and Treatment Plan, "Has been exposed to a traumatic event involving actual or perceived threat of death or serious injury. Reports response of intense fear, helplessness, or horror to the traumatic event. Experiences disturbing and persistent thoughts, images, and/or perceptions of the traumatic event. Experiences frequent nightmares. Describes a reliving of the event, particularly through dissociative flashbacks. Displays significant psychological and/or physiological distress resulting from internal and external clues that are reminiscent of the traumatic event. Intentionally avoids thoughts, feelings, or discussions related to the traumatic event. Intentionally avoids activities, places, people, or objects (e.g., up-armored vehicles) that evoke memories of the event. Displays a significant decline in interest and engagement in activities. Experiences disturbances in sleep. Reports difficulty concentrating as well as feelings of guilt. Reports hypervigilance. Demonstrates an exaggerated startle response. Symptoms present more than one month. Impairment in social, occupational, or other areas of functioning". Dx: Post-traumatic stress disorder. Plan: therapy sessions

2/28/2023, J Skinner, LMFT, Psychotherapy note, "PT began to session by talking about the dramatic increase the symptoms of stress he had noticed over the last couple of weeks after hearing rumors that his agency might be terminating additional employees. PT went on to say that he had heard that two officers had recently been fired, but that he was not sure it's all the details that lead up to their termination. However, PT was certain that neither one of the officers were present for the shooting that he had been previously involved in. PT also talked

about ongoing feelings of anxiety, as well as hyper vigilance and talked about an example in which a vehicle unfamiliar to him drove down the street in front of his house, and that his first thought was that it was a surveillance vehicle. PT then talk about the impact that being on administrative leave has had on him as a husband and father, noting that the transition for him have been very difficult as he had previously been the bread winner of the family."

3/7/2023, J Skinner, LMFT, Psychotherapy note, "PT began to session by talking about some of the rumors that he has been hearing about his agency, as well as the fact that he had been focused on, trying to stay as positive as possible, and not allow the ongoing stress to affect his day-to-day life. PT went on to talk about the struggles he had been dealing with over the fact that his wife was now the primary breadwinner and while he felt thankful over the fact that he did not have to worry about finances, he struggled with how he was raised by his grandfather, to always be responsible, and to always support his family"

3/14/2023, J Skinner, LMFT, Psychotherapy note, "PT began to session by talking about a phone call he received last Wednesday from a sergeant at his department, who called to officially informed PT that he was currently under internal affairs investigation linked to an investigation that the FBI was conducting. PT went on to talk about the fact that he had made his attorney aware of the conversation who interpreted the possibility of good news, as he had not yet been served with an intent to terminate letter. PT then talked about some of the symptoms he had been noticing over the last year, which had included hypervigilance, an exaggerated startle response as well as active avoidance of any reminders of the incident."

3/21/2023, J Skinner, LMFT, Psychotherapy note, "PT began to session by saying that he did not have any updates regarding his job, but that he had noticed an improvement of mood, which he attributed to the fact that he had been able to spend some time working on a construction project. PT went on to talk about the ongoing difficulty, he has been dealing with, regarding not knowing what his status was at work as well, as the fact that he was hoping for the process to end quickly so that he could resume his life"

3/27/2023, Contra Costa County District Attorney Office, Investigation report, (text covered) "Based on the above listed review, sworn law enforcement members of the CCCDAO and the FBI found text communications between sworn law enforcement members of the Antioch Police Department that we believe may have violated the Racial Justice Act. This report documents some of the derogatory, homophobic, and sexually explicit language and photographs shared by members of the Antioch Police Department that demonstrates their racial bias and animus towards African Americans and other people of color in the community. This report does not include every derogatory text message retrieved during our review of the above listed cellular telephones. This is an ongoing state and federal criminal investigation which may lead additional disclosures. This report also documents potential dishonesty, perjury, abuse of authority, and the violation of individuals civil rights" (text communications between officers follow, including photos of gorillas)

3/28/2023, Contra Costa County District Attorney Office, Investigation report, (text covered) "Based on the above listed review, sworn law enforcement members of the CCCDAO and the FBI found text communications between sworn law enforcement members of the Antioch Police Department that we believe may have violated the Racial Justice Act. This report documents some of the derogatory, homophobic, and sexually explicit language and

photographs shared by members of the Antioch Police Department that demonstrates their racial bias and animus towards African Americans and other people of color in the community. This report does not include every derogatory text message retrieved during our review of the above listed cellular telephones. This is an ongoing state and federal criminal investigation which may lead to further disclosures. This report also documents potential dishonesty, perjury, abuse of authority, and the violation of individuals civil rights. (texting communications between officers follow)

3/28/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about a recent phone call, he received from a sergeant and former mentor that he had not heard from in over eight months. PT went on to talk about the spike in anxiety he noticed each time he received a call from someone from his department in one hour to talk about the confusion he experienced over learning from the sergeant that there were no rumors of his termination. In addition, PT said he was told by the sergeant that the sergeant wanted him to participate in a debriefing regarding the shooting that he was in last year, but admin would not allow it as he was currently on leave. PT also talked about his ongoing feeling of disappointment toward his former department, as well as the fact that he had been prevented from having any communication with his best friend for the last several months, and was saddened to hear that his best friend who is going to have another child, and that PT would not be allowed to be a part of that experience"

4/4/2023, J Skinner, LMFT, Psychotherapy note, "PT began to session by talking about how he came to learn that an additional eight officers had been walked out of the building and that they were currently on administrative leave. PT went out to talk about the fact that while he felt horrible for his fellow officers, he also felt a bit of validation in that other people were experiencing the same mistreatment from the organization that he has been experiencing for the last 15 months. PT went on to talk about the work he had been putting into thinking more positively about his life, noting that there were other people in the world that had a much more difficult time than he had been experiencing, but also talked about symptoms related to post traumatic stress disorder that he had noticed such as having no desire whatsoever to fire any weapon and noted that he had not done so since his officer involved shooting"

4/13/2023, J Skinner, LMFT, Psychotherapy note, "PT began to session by talking about shock and incredible amounts of stress he had been experiencing throughout the day after learning that the mercury news had released text messages between himself and fellow coworkers on their personal phones in which they talk about ongoing investigations, as well as participated and joking about some of the experiences they had. As a result, PT said he had been inundated with calls from the media, and also talked about the fact that his wife had been mentioned in the article, and that she had also been overwhelmed with requests from the media. During the session, PT said he learned that the district attorney's office had released his personal phone number to the public as well as the phone numbers of the other officers involved. PT went on to say that had not been for his wife and children that he would have suicided already and she could no longer stand the pressure and scrutiny. PT also talked about the impact. This press release has had on his family and that his wife's ex-husband had made it clear that he did not want PT spending any time with their son nor did he want PT to take their son to an upcoming baseball game this weekend. PT also said he planned on having a phone conversation with his

attorney later today as well as the fact that he never felt a greater anxiety about being taken into custody than he had been feeling today."

4/17/2023, J Skinner, LMFT, Email to Ethics Department, "I am a licensed marriage and family therapist and specialize in working with members of the first responder community. Approximately a month ago, I was assigned a client by a separate private practice of which I do contract board from time to time. During the first session with this client, he told me his reason for seeking therapy was due to overwhelming stress after being placed on administrative leave, after an officer involved shooting in which he was forced to take the suspect's life. As the sessions progressed, it became clear that the client was also under investigation by the FBI, but for an unknown reason. Last week, the client revealed due to media coverage that he was being investigated for racist behavior via text message with several other officers in violation of department policy in California state law. As a retired police officer myself I was sickened to read the text messages that were leaked from the district attorney's office and provided to the press as well as shocked that these officers could be both so hateful, and so stupid. At this point, l assume my client will be criminally, charged at some point, which will most likely result in a lengthy, criminal trial as it involves so many people obviously, I have an ethical obligation not to abandon my client, but I am struggling with trying to help someone who have behaved in such a abhorrent way. It may be helpful to know that the private practice that referred this client to me has a contract with the city that the client works for as well as the fact that I am the third clinician he has seen in less than a year due to high turnover at that private practice."

4/18/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about how disappointed he was and sad for his wife last Sunday after learning that she had been terminated from her job in spite of the fact that she had a signed contract, guaranteeing employment until August. PT also talked about the fact that a couple of news outlets actually released his wife's name which resulted in a deluge of phone calls from people that his wife did know as well as people that she did not know as well as a large number of people that she did not know reaching out to her on social media. PT went on to say that he was ashamed of the things that he texted to other officers that were revealed in a report leaked by the District Attorney's Office, and he would take whatever punishment was required. However, PT said that he was struggling with the fact that they had also made his wife a target, and that the two of them have been talking more and more about selling their home and leaving the state when this case is over. During the session, a conversation was had with a client about the ethical dilemma that I was facing both being a former police officer, but also a former member of the Antioch Police Department. During that conversation, I made it known to PT that his behavior as well as the behavior of his other fellow officers, had made the job of law-enforcement that much more difficult, and that if we reached a point in sessions, where l could not ethically continue to treat, we would then have to talk about ways in which he could be referred out"

5/2/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about how difficult the life of his wife had become as a result of the media publishing her information which included being released from a job earlier than anticipated without explanation and also being harassed on social media. PT went on to talk about the fact that his wife met with two separate family law attorneys to talk to them about the possibility of changing her name as well as the possibility of filing for divorce. PT added his wife discussed with him that she was having

Re: Eric Rombough

a difficult time dealing with the pressure that had come from the ongoing investigation but that she also wanted to do what was best for her two children. PT went on to talk about the fact that he had not been able to see his stepson play baseball for the last two weeks and had been excluded from all upcoming games. However, PT said that his wife has decided that she wanted to remain in the marriage as she still loved him with the hope that all of this will be over soon. PT then talked about the stress and anxiety he was feeling about an upcoming Internal affairs interview on May 17th as well as the fact that this process had prevented him from dealing with the officer involved shooting he was and from which he was still having nightmares and intrusive dreams"

5/9/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about the fact that he had an internal affairs interviews scheduled for next Wednesday, May 17th as well as the fact that he had received a subpoena to testify in court on May 19th from the district attorney's office. PT went to say that he was not sure what type of court appearance he would have to attend but added that he suspected they would try and ask him questions to incriminate himself. Pete even talked about the ongoing stress he has been dealing with as a result of the ongoing investigation and media interest as well as how difficult this process has been this far for his wife. PT then talked about the difficulty he's been having sleeping noting, that he was commonly waking up 3 to 4 times a night and was generally not sleeping for more than two hours at a time. PT also talked about the difficulties he had been having in reconciling what happened regarding his officer involved shooting as well as how disappointing he was for not being recognized for doing a good job."

5/16/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about the fact that he was still experiencing nightmares and intrusive dreams about the shooting that he was involved in noting that in many of the nightmares, he is re-experiencing the event but in others, was behind a ballistic shield taking gunfire with no ability to return fire. PT went on to talk about the stress he had been experiencing throughout the day as he would have to report to internal affairs tomorrow for an interview as well as the fact that he had been subpoenaed for court on Friday but was hoping that he would not have to go"

5/22/2023, A Rucekova, MD, DFR, 43 Y male who present to occupational medicine clinic for stress. Patient has been participating in action that involved active shooter and has been shot at where the shooter has been killed. Patient stated accumulation of witnessing over violence has been traumatic and he has developed insomnia and stress and depressed mood. Patient states he has been on administrative leave since December shooting and is meeting weekly with mental health counselors. "Psychiatric: negative for homicidal/suicidal ideations". Dx: PTSD. Plan: mental health provider consult

5/25/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about a recent appointment, he had with a physician at Kaiser and wanted to talk about how difficult it was to summarize his symptoms of PTSD, as well as the multiple traumatic experiences he had within a 10 to 15 minute appointment. PT also talked about the fact that he had to report back to the same doctor again in a couple of weeks at which time she would refer him to a psychologist within the Kaiser network. PT then talked about the experience. He had during the internal affairs interview as well as how shocked he was by some of the questions which indicated to him that the investigator had no real idea as to what was going on. With his

attorney present, and on his attorney's advice, PT declined to answer any questions. PT also talked about his concern for his stepson who was not doing well in school and had been dealing with tremendous stress himself not just because of what PT was going through but also because of the fact that his biological father and step mother were going through a divorce" 6/6/2023, A Rucekova, MD, PR-2, "Patient has been participating in action that involved active shooter and has been shot at where the shooter has been killed. Patient stated accumulation of witnessing over violence has been traumatic and he has developed insomnia and stress and depressed mood". Pending authorization for mental health provider consult
6/7/2023, J Skinner, LMFT, Psychotherapy note, "PT went on to talk about the financial stress he had been experiencing and as a result, he decided to take on a couple of side jobs in construction as well as the fact that his wife was picking up extra shifts"
6/15/2023, US District Court, Complaint for damages, Investigative report was published on 3/28/2023, detailing crimes of moral turpitude and criminal offenses committed by members of Antioch Police Department. "Antioch police officers and sergeants exchanged hundreds of salacious text messages riddled with vile and offensive language about community members. In those text threads, officers bragged about using excessive force and beating arrest subjects so severely that the officers themselves hurt their hands and feet. The District Attorney's report detailed "derogatory, homophobic, and sexually explicit language and photographs shared by members of the Antioch Police Department that demonstrates their racial bias and animus towards African Americans and other people of color in the community." Over a period of at least four years, the City of Antioch Police Department regularly referred to its citizens as "niggers," "niggas," "monkeys," "gorillas," "faggots," "water buffalos," "cunts," "pussies," "fat bitches," and more. Officers celebrated the violent targeting of Black community members ("we just ran down a monkey"; "I'm only stopping them cuz they black"; "I'll bury that nigger in my fields"; "I can't wait to forty all of them"). Furthermore, officers admitted to serious acts of lying and falsification ("we'll just say he refused to comply"; "I sometimes just say people gave me a full confession when they didn't. gets filed easier"). Appallingly, at least 45 officers participated in or were aware of this misconduct and did nothing. Plaintiff Allen was brutally beaten by Officer Eric Rombough on 3/30/2021, who also stated "I tried to knock him unconscious" and referred to Allen as "faggot" and "nigger" multiple times. Allen is still incarcerated after his arrest for attempted murder on 3/30/2021. Plaintiffs hereby demand a jury trial in this action
6/16/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about the dramatic increase in the symptoms of stress that he has been noticing over the last week adding that he heard from his attorney that a grand jury had been convened to review possible charges against him."
6/21/2023, J Skinner, LMFT, Psychotherapy note, Pt "talked about the anxiety he was experiencing over a federal grand jury that had been commissioned and also talked about his hope to someday move out of the state of California when all of these legal processes are completed."
6/28/2023, J Skinner, LMFT, Psychotherapy note, Pt "talked about a breakdown of communication between himself and his wife which he believed was due to high levels of stress

and added that he hoped to have an additional conversation with her during which they could patch things up"

7/7/2023, J Skinner, LMFT, Psychotherapy note, Pt "talked about the fact that he reached out to the treatment center that he had been referred to by municipal pooling authority and that in spite of leaving numerous messages, he had still not heard back from them"

7/10/2023, A Rucekova, MD, PR-2, Telehealth. Pt has been on administrative leave since "December shooting", meeting weekly with Mental Health counselors. No sleep improvement so far. No meds. MSE - normal. Dx: Posttraumatic Stress Disorder (PTSD). Plan: transfer care to Mental Health. Work status - off duty.

7/12/2023, J Skinner, LMFT, Psychotherapy note, Pt talked about how he came to learn that a friend and former police officer had received a subpoena to testify at a grand Jury which caused a ramp up any symptoms of anxiety for Pt

7/26/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about the cumulative stress he was experiencing last Thursday prior to a court appearance and that he noticed throughout the day that he was losing tools and small items such as his keys only to later find his keys in his pocket. PT went on to talk about being assaulted by the brother of one of the murder suspects in the hallway of the courtroom as well as the fact that he had to sit in the hallway the entire day and was never asked to testify"

7/28/2023, US District Court, Complaint for damages, "Defendant OFFICER ERIC ROMBOUGH ("ROMBOUGH") at all times mentioned herein, was employed by Defendant CITY as an OFFICER of the CITY and was acting within the course and scope of that employment. He is being sued individually and in his official capacity as an OFFICER of the CITY. ROMBOUGH is a key participant in the District Attorney's investigation into the discriminatory text messages sent among Antioch Police Department officers and sergeants. ROMBOUGH sent text messages to other Antioch officers in which he referred to Black people as "niggers," "niggas," "gorillas," and "monkeys." On other occasions, ROMBOUGH boasted about "violating civil rights" and "only stopping [people] cuz they black [sic]." Plaintiffs hereby demand a jury trial in this action

8/4/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about how exhausted he had been over the last three days noting that he rarely got more than 2 to 3 hours of sleep a night due to his ongoing cumulative stress and anxiety about any possible charges against him. PT went on to say that he spoke with his defense attorney who told him that he had no idea how long this process would take and went on to talk about the unprecedented nature of this grand jury hearing and the leaks from the district attorney's office."

8/11/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about how frustrated he felt yesterday after receiving a letter from MPA denying his PTSD claim."

8/16/2023, US District Court, Indictment, Defendants communicated with one another and others known and unknown to the Grand Jury about their actual and intended uses of force, including about specific violent acts that constituted excessive uses of force by a police officer against individuals in and around Antioch..  As a further part of the scheme, Defendants deployed uses of force as "punishment" to subjects beyond any punishment appropriately imposed by the criminal justice system, and/or made repeated reference to or suggestion of "violating civil rights", including in the communications identified in this Indictment..  After each

of their involvement in incidents involving uses of force, Defendants authored police reports containing false and misleading statements to suggest that the force they used was necessary or justifiable. In truth and in fact, and as Defendants well knew, Defendants willfully used excessive force in numerous incidents, including those identified in this Indictment. Example of officers' comm: "ROMBOUGH: Yeah buddy we gonna fuck some people up […] I'll roll with u and Percy […] Didn't know if You were already there AMIRI: LOL! no i was planning on enjoying the day off but fuck them for fucking with [an officer] ROMBOUGH: Me too and exactly I'm gonna fuck someone up and hopefully get you a bite AMIRI: exactly! blood for blood ROMBOUGH: Liked "exactly! blood for blood"".

8/18/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about how terrified he was yesterday morning when he was arrested by the FBI and transported to federal court wearing only a pair of shorts"

9/1/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about learning that the legal Defense fund would only cover 50% of the cost of his defense attorney because he was charged with conspiracy"

9/7/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about how difficult his day-to-day life had become and went on to talk about ongoing issues staying asleep noting that he often woke up at approximately 3 o'clock in the morning due to a startle reflex that it would prevent him from getting back to sleep. PT went on to talk about how difficult it had been for him to have flashbacks and recurring thoughts about his shooting when he was engaged in reading a book for fun that has nothing to do with Law Enforcement."

9/21/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about a job offer he received as well as the fact that he planned on starting a new job on October 2nd. PT went on to talk about the ongoing stress that he has been dealing with as well as the fact that he was still having difficulty sleeping and dealing with persistent thoughts regarding his officer involved shooting even when he was not reminded of the event"

9/28/2023, J Skinner, LMFT, Psychotherapy note, Pt "talked about the ongoing stress he had been dealing with in his home life and went on to talk about the father of his stepson and how that father's recent divorce has impacted his family."

10/2/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about the combination of anxiety, anger and opportunity that he has been experiencing regarding his new job as well as his recent separation from the Antioch Police Department"

10/17/2023, J Skinner, LMFT, Psychotherapy note, "PT began the session by talking about his new job as well as how nice it felt to be valued as an employee as well as how much of a relief it was to know that he would be able to financially support his family"

12/21/2023, US District Court, Complaint for damages, "The widespread abuse by large numbers of the Antioch Police Department population, detailed in the investigative report (3/28/2023), highlights a pattern and practice of discriminatory law enforcement based on race and gender. Officers engaged in vile derogatory speech, physical mistreatment of community members, and violations of individual civil rights. The abuses in question were the product of a culture of intolerance within the City of Antioch Police Department. This culture is rooted in the deliberate indifference of high ranking City officials, who have routinely acquiesced in the misconduct and otherwise failed to take necessary measures to curtail and prevent it. Despite

the repeated and frequent nature of the misconduct and civil rights violations committed by its officers, high ranking City of Antioch officials failed to take any or appropriate remedial action. As a result, officers engaged in repeated and serious acts of misconduct and civil rights violations against citizens living, visiting, and/or traveling in Antioch. Plaintiffs, all of whom experienced malicious treatment by Antioch Police Department officers during the time frame in which officers exchanged these text messages, recently discovered that the officers' treatment of them was based in racial animus, misogyny, homophobia, and other offensive conduct. Plaintiffs have reason to believe that each of their interactions with Antioch Police Department officers constituted numerous civil rights violations. Plaintiffs are informed and believe and thereon allege that said civil rights violations and/or misconduct included, but was not limited to, assaults, beatings, false arrests, unreasonable searches and seizures, intimidation, false imprisonment, malicious prosecution, denial of equal protection, racial discrimination, conspiracy to violate civil rights and/or other misconduct." "ROMBOUGH robbed Plaintiff YOUNG and was involved in the unlawful arrest of Plaintiff TERRY THOMAS. ROMBOUGH is also a key participant in the District Attorney's investigation into the discriminatory text messages sent among Antioch Police Department officers and sergeants. ROMBOUGH sent text messages to other Antioch officers in which he referred to Black people as "niggers," "niggas," "gorillas," and "monkeys." On other occasions, ROMBOUGH boasted about "violating civil rights" and "only stopping [people] cuz they black [sic]." ROMBOUGH'S actions are indicative of the conspiracy between the officers at the Antioch Police Department". Plaintiffs hereby demand a jury trial in this action.

**Attachment B**

**Psychological Testing Results and Interpretation**

**LEVEL 2 GENERALIZED ANXIETY DISORDER:**

The Severity Measure for Generalized Anxiety Disorder - Adult assesses the severity of generalized anxiety disorder in individuals aged 18 and older. The items evaluate the level to which the patient has been bothered by thoughts, feelings, and behaviors, often tied to concerns about family, health, finances, school, and work. Each item asks the individual to rate the severity of his or her generalized anxiety disorder during the past 7 days. Each item on the measure is rated on a 5-point scale ranging from 0 (Never) to 4 (All of the time). Raw scores are summed up and divided by the number of items (10) to provide an average total score.

Average total scores are interpreted as follows:
0 = None
1 = Mild
2 = Moderate
3 = Severe
4 = Extreme

The patient obtained a total average score of 2.5.
The clinician obtained a total average score of 2, suggesting the patient is experiencing moderate generalized anxiety.

**LEVEL 2 ANGER:**

The DSM-5 Level 2 Anger - Adult measure assesses the pure domain of anger in individuals aged 18 and older. The items evaluate the level to which the patient has been bothered by feeling irritable, angry, ready to explode, grouchy, and annoyed. Each item asks the patient to rate the severity of their anger during the past 7 days. Each item is rated on a 5-point scale ranging from 1 (never) to 5 (always). The patient's raw scores are then summed and converted to a corresponding T-score.

The T-scores are interpreted as follows:
Less than 55 = None to slight
55.0—59.9  = Mild
60.0—69.9  = Moderate
70 and over  = Severe

The patient obtained a T-score of 67.2.
The clinician obtained a T-score of 67.2, suggesting the patient is experiencing moderate anger.

Re: Eric  Rombough
03/11/2024                                                          Page **28** of **33**

**LEVEL 2 SLEEP DISTURBANCE:**

The DSM-5 Level 2 Sleep Disturbance - Adult measure assesses the pure domain of sleep disturbance in individuals aged 18 and older. The items evaluate the level to which the patient has been bothered by problems with sleep that affected their overall quality of sleep. Each item asks the patient to rate the severity of their sleep disturbance during the past 7 days. Each item is rated on a 5-point scale ranging from 1 (never) to 5 (always). The patient's raw scores are then summed and converted to a corresponding T-score.

The T-scores are interpreted as follows:
Less than 55 = None to slight
55.0—59.9  = Mild
60.0—69.9  = Moderate
70 and over  = Severe

The patient obtained a T-score of 66.1.
The clinician obtained a T-score of 64.9, suggesting the patient is experiencing moderate sleep disturbance.

**EPWORTH SLEEPINESS SCALE (ESS):**

The ESS is a self-administered questionnaire with 8 questions. It provides a measure of a person's general level of daytime sleepiness, or their average sleep propensity in daily life. It has become the world standard method for making this assessment.

The ESS asks people to rate, on a 4-point scale (0 – 3), their usual chances of dozing off or falling asleep in 8 different situations or activities that most people engage in as part of their daily lives, although not necessarily every day. The total ESS score is the sum of 8 item-scores and can range between 0 and 24. The higher the score, the higher the person's level of daytime sleepiness.

| ESS score | Level of Sleepiness |
|---|---|
| 0-7 | Abnormal sleepiness is unlikely |
| 8-9 | Average amount of sleepiness |
| 10-15 | Sleepiness may be excessive |
| 16-24 | Excessive sleepiness |

The patient obtained a total score of 7. The clinician also obtained a total score of 7 which suggests that an abnormal amount of daytime somnolence is unlikely.

**LEVEL 2 SOMATIC SYMPTOM:**

Re: Eric  Rombough
03/11/2024                                                              Page **29** of **33**

The DSM-5 Level 2 Somatic Symptom - Adult measure assesses the domain of somatic symptoms. The items evaluate the level to which the patient has been bothered by unexplained aches and pains, and/or feeling that their illnesses are not being taken seriously enough. Each item asks the individual (or informant) to rate the severity of the individual's somatic symptoms during the past 7 days. Each item is rated on a 3-point scale ranging from 0 (not bothered at all) to 2 (bothered a lot). The patient's raw scores are then summed to provide a total score.

Total scores are interpreted as follows:
0-4 = Minimal
5-9 = Low
10-14 = Medium
15-30 = High

The patient obtained a total score of 20.
The clinician obtained a total score of 16, suggesting the patient is experiencing a high severity of somatic symptoms.

**QIDS – QUICK INVENTORY OF DEPRESSIVE SYMPTOMATOLOGY:**

Quick Inventory of Depressive Symptomatology (QIDS) is available in the clinician (QIDS-C16) and self-rated versions (QIDS-SR16). It is designed to assess the severity of depressive symptoms. QIDS assess all the criterion symptom domains designated by the American Psychiatry Association Diagnostic and Statistical Manual of Mental Disorders to diagnose a major depressive episode. These assessments can be used to screen for depression, although they have been used predominantly as measures of symptom severity. Scores on the QIDS typically fall into the following ranges:

1 -5     = No
6-10    = Mild
11-15 = Moderate
16-20 = Severe
21-27 = Very severe

On the self-report version of the QIDS, the examinee obtained a score of 19, on the clinician rated version of the QIDS the score was 15 and this may indicate moderate clinical depression.

**SYMPTOM CHECKLIST-90-R:**

The Symptom Checklist-90-Revised (SCL-90-R) is a 90-item self-report symptom inventory. It is a measure of current, point-in-time, psychological symptom status. It is not a measure of personality.

Somatization (SOM)

Re: Eric Rombough
03/11/2024                                                          Page **30** of **33**

The Somatization dimension reflects distress arising from perceptions of bodily dysfunction. Complaints focus on cardiovascular, gastrointestinal, respiratory, and other systems with strong autonomic reactions. Pain and discomfort of the gross musculature and additional somatic equivalents of anxiety are also components of Somatization.

The respondent's T-score of 68 is above average and is indicative of a clinical picture involving enhanced distress associated with somatic complaints.

Obsessive-Compulsive (O-C)

The Obsessive-Compulsive dimension includes symptoms that are often identified with the standard clinical syndrome of the same name. This measure focuses on thoughts, impulses, and actions that are experienced as unremitting and irresistible and that are of an ego-alien or unwanted nature. Behavior and experiences of a more general cognitive performance deficit are also included in this measure. The respondent's T-score of 64 is above average for an outpatient subject and may be clinically significant.

Interpersonal Sensitivity (I-S)

The Interpersonal Sensitivity dimension focuses on feelings of inadequacy and inferiority, particularly in comparison with other people. Self-deprecation, self-doubt, and marked discomfort during interpersonal interactions are characteristic manifestations of this syndrome. In addition, individuals with high scores on I-S report acute self-consciousness and negative expectations concerning interpersonal behavior with others and others' perceptions of them. The respondent's T-score of 62 in this category provides evidence to suggest that the patient is experiencing difficulties with feelings of personal inadequacy and considerations about devalued self-worth; with distress which may be clinically significant.

Depression (DEP)

The symptoms of the Depression dimension reflect a representative range of the manifestations of clinical depression. Symptoms of dysphoric mood and affect are represented, as are signs of withdrawal of life interest, lack of motivation, and loss of vital energy. In addition, feelings of hopelessness, thoughts of suicide, and other cognitive and somatic correlates of depression are included. The respondent's T-score of 64 shows a level of depression which is moderately elevated and clinical in nature. There is evidence suggesting a depressive disorder may be present.

Anxiety (ANX)

General signs of anxiety such as nervousness, tension, and trembling are included in the definition, as are panic attacks and feelings of terror, apprehension, and dread. Some somatic correlates of anxiety are also included as dimensional components.

The respondent's T-score of 61 reflects an above average level of anxiety, which is clinical in nature. Evidence suggests that the patient may be suffering from a clinical anxiety state or may be experiencing anxiety secondary to the emergence of another psychiatric disorder.

Hostility (HOS)

Re: Eric Rombough
03/11/2024                                                                Page **31** of **33**

The Hostility dimension reflects thoughts, feelings, or actions that are characteristic of the negative affect state of anger. The selection of items includes all three modes of expression and reflects qualities such as aggression, irritability, rage, and resentment.
The respondent's T-score of 58 for hostility is above average and may be indicative of clinically significant level or irritability and resentment.

Phobic Anxiety (PHOB)
Phobic Anxiety is defined as a persistent fear response to a specific person, place, object, or situation-that is irrational and disproportionate to the stimulus and leads to avoidance or escape behavior. The items of this dimension focus on the more pathognomonic and disruptive manifestations of phobic behavior. Phobic Anxiety is very similar in definition to "agoraphobia" (Marks, 1969), also called "phobic-anxiety-depersonalization syndrome" by Roth (1959).
The respondent's T-score of 63 reveals levels of phobic anxiety above the normative mean, but not of a nature to be truly remarkable.

Paranoid Ideation (PAR)
The Paranoid Ideation dimension represents paranoid behavior fundamentally as a disordered mode of thinking. The cardinal characteristics of projective thought, hostility, suspiciousness, grandiosity, centrality, fear of loss of autonomy, and delusions are viewed as primary reflections of this disorder, and item selection was oriented toward representing this conceptualization.
The respondent's T-score of 64 provides some evidence of suspiciousness, which is above the ordinary range and may be clinically significant.

Psychoticism (PSY)
The Psychoticism dimension was designed to represent the construct as a continuous dimension of human experience. Items indicative of a withdrawn, isolated, schizoid lifestyle were included as were first-rank symptoms of schizophrenia, such as hallucinations and thought control. The Psychoticism dimension provides for a graduated continuum from mild interpersonal alienation to dramatic psychosis.
The respondent's T-score of 51 is in the low clinical range. However, it is more likely that this reflects an intense experience with social alienation, rather than a thought disorder.

Global Indices (GSI, PST, PSDI)
The function of each of these global measures is to communicate in a single score the level or depth of the individual's psychological distress. Each measure reflects a somewhat different aspect of psychological distress. When used in a configural manner, these indices provide data that are very helpful in accurately assessing the clinical picture. The Global Severity Index (GSI) is the best single indicator of the current level or depth of the disorder. It combines information concerning the number of symptoms reported with the intensity of perceived distress. The GSI should be used in most instances where a single summary measure is called for. The Positive Symptom Distress Index (PSDI) functions as a measure of response style by indicating whether the respondent was augmenting or attenuating symptomatic distress. That is, the PSDI reflects

the average level of distress reported for the symptoms that were endorsed. As such, it can be interpreted as a measure of symptom intensity. The Positive Symptom Total (PST) is simply a reflection of the number of symptoms endorsed by the respondent, regardless of the level of distress reported. It can be interpreted as a measure of symptom breadth.

GSI T-score of 66 falls at or above the 84%ile and suggests the patient is reporting a very high intensity of perceived distress.

PSDI T-score of 59 is suggestive of average, clinically significant psychological distress.

PST T-score of 68 falls at or above the 84%ile suggesting the patient is over-reporting symptoms, reflecting a dramatized response approach.

**PTSD CHECK LIST 5 (PCL 5):**

The PCL 5 is a 20-item self-report measure of the 20 DSM-5 symptoms of PTSD. The PCL 5 has a variety of purposes, including:
- Screening individuals for PTSD,
- Making a provisional PTSD diagnosis,
- Monitoring symptom change during and after treatment.

The PCL 5 asks about symptoms in relation to "stressful experiences." The PCL 5 is useful because it can be used with any population. The symptoms endorsed may not be specific to just one event, which can be helpful when assessing survivors who have symptoms due to multiple events. Typically, it is optimal to assess traumatic event exposure to ensure that a respondent has experienced at least one traumatic (Criterion A) event.

A provisional PTSD diagnosis can be made by treating each item rated as 2 = "Moderately" or higher as a symptom endorsed, then following the DSM-5 diagnostic rule which requires at least: 1 B item (questions 1-5), 1 C item (questions 6-7), 2 D items (questions 8-14), 2 E items (questions 15-20). In addition, a total score of at least 31 is required.

The examinee obtained a total score of 63 which in conjunction with the endorsement of required numbers of items in each cluster is positive for the DSM-5 diagnosis of PTSD.

**CLINICIAN-ADMINISTERED PTSD SCALE FOR DSM-5 (CAPS-5):**

The CAPS-5 is the gold standard in PTSD assessment. The CAPS-5 is a 30-item structured interview that corresponds to the DSM 5 criteria for PTSD. The CAPS-5 can be used to make a current (past month) or lifetime diagnosis of PTSD or to assess symptoms over the past week. In addition to assessing the 20 PTSD symptoms, questions target the onset and duration of symptoms, subjective distress, and the impact of symptoms on social and occupational functioning, improvement in symptoms since a previous CAPS administration, overall response validity,

Re: Eric Rombough
03/11/2024                                                           Page **33** of **33**

overall response validity, overall PTSD severity, and specifications for the dissociative subtype (depersonalization and derealization). For each item, standardized questions and probes are provided. CAPS-5 also allows rating of severity of PTSD symptoms by summing the frequency and intensity ratings for each symptom (except for amnesia and diminished interest which are based on amount and intensity). Administration on the CAPS-5 requires identification of an index traumatic event to serve as a basis for symptom inquiry. The Life Events Checklist for DSM 5 (LEC-5) is recommended in addition to the Criterion A included in CAPS-5.

The results of the CAPS-5 are consistent with a DSM-5 diagnosis of PTSD. The patient identified a specific traumatic event (A criteria). The patient endorsed 3 out of 5 B criteria with a minimal required number of 1, ranging from moderate to severe. The patient meets 2 out of 2 C criteria with a minimal required number of 1, ranging from moderate to severe. He meets 4 out of 7 D criteria with a minimal required number of 2, ranging from moderate to severe.  He also meets 3 out of 6 E criteria with a minimal required number of 2, ranging from moderate to severe. Furthermore, the patient has experienced disturbance which has lasted more than one month (F criteria) and his symptoms have caused clinically significant distress and functional impairment (G criteria).

**STATE OF CALIFORNIA**

DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF WORKERS' COMPENSATION
MEDICAL UNIT
*MAILING ADDRESS:*
*P. O. Box 71010*
*Oakland, CA 946123*
(510) 286-3700 or (800) 794-6900    Fax: (510) 622-3467

## VOLUNTARY DIRECTIVE FOR ALTERNATE SERVICE OF MEDICAL-LEGAL EVALUATION REPORT ON DISPUTED INJURY TO PSYCHE
### (Unrepresented Employees Only)

**Injured Employee Name:** *Eric Rombough*

**Date of Injury:** *04/01/2023*

**Claim No.:** *WC-2405-AN*

**EAMS or WCAB Case No.:** _____

**Claims Administrator:** *Angelique Horton, MPA*

**Name of QME:** *Vladimir Bokarius, MD, PhD, QME*

**Date of Evaluation Exam:** *03/11/2024*

I, *Eric Rombough* ,
*(print name of injured employee)*

understand I have a right to be served with a copy of the medical-legal evaluation report written about my case by the QME physician named above, at the same time as a copy of the report is sent to the claims administrator and/or the Disability Evaluation Unit.

By signing below, I hereby direct that the QME serve my copy of the medical/legal report in the following manner:

*(Check one)*

☐ By sending my copy to the following physician who will review it with me and will be paid for an office visit for this purpose by the claims administrator, or if none by my employer. The physician I name below may be my primary treating physician in this case or any other physician I wish to designate. At the end of that visit, the physician named below will give me my copy of the report:

**Physician Name:** _____

**Address:** _____

**City:** _____ **State:** _____ **Zip:** _____

**Phone:** _____

☑ Only by sending a copy to me at my address on file. I do not wish to designate a physician to review it with me.

I am signing this directive voluntarily and of my own free will:

_____                    *3/11/24*
*(Signature of Injured Employee)*                    *Date*

Original of this signed form – attach to original medical-legal report
Copies of this signed form – to injured employee, claims administrator, reviewing physician, QME

QME Form 120 (rev. February 2009)



**STATE OF CALIFORNIA**
**Division of Workers' Compensation**
**Disability Evaluation Unit**

Reset Form    Print Form

**EMPLOYEE'S DISABILITY QUESTIONNAIRE**

DEU Use Only

This form will aid the doctor in determining your permanent impairment or disability. Please complete this form and give it to the physician who will be performing the evaluation. The doctor will include this form with his or her report and submit it to the Disability Evaluation Unit, with a copy to you and your claims administrator.

**Employee**

ERIC
First Name

A
MI

RUMBJUGIT
Last Name

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
SSN (Numbers Only)

1692   ROCKVILLE   RD
Street Address 1/PO Box (Please leave blank spaces between numbers, names or words)

Street Address 2/PO Box (Please leave blank spaces between numbers, names or words)

International Address (Please leave blank spaces between numbers, names or words)

FAIRFIELD
City

CA
State

94534
Zip Code

Date of Birth   05/31/1979
                MM/DD/YYYY

Date of Injury   4/1/23
                 MM/DD/YYYY

CITY   OF   ANTIOCH
Employer

PUBLIC   SAFETY
Nature of Employers Business

Claim Number 1   WC-2405-AN

DWC-AD form100 (DEU) Page 1 (REV. 11/2008)

DWC-AD form100 (DEU)

Claim Number 2 _____

Claim Number 3 _____

Claim Number 4 _____

Claim Number 5 _____

**PLEASE ANSWER THE FOLLOWING QUESTIONS FULLY:**
**How was your evaluating doctor selected? (check one)**

[X] From a list of doctors provided by the State of California, Division of Workers' Compensation.

[ ] Other    (explain)    _____

What is the name of the doctor who will be doing the evaluation?  DR  V  BOKARTUS

When is your examination scheduled?  3/1/24

What were your job duties at the time of your injury?

POLICE OFFICER, SWAT TEAM, GANG UNIT, PROBLEM ORIENTED
PATROL OFFICER                                    POLICING UNIT

What is the disability resulting from your injury?

PTSD

How does this injury affect you in your work?

CAN'T SLEEP, NIGHTMARES, WEIGHT GAIN, ISOLATION, ETC

Have you ever had a disability as a result of another injury or illness?  NO

If so, when?  _____

Please describe the disability?

Date  3/11/2024
      MM/DD/YYYY

Signature  a_____

DWC-AD form100 (DEU) Page 2 (REV. 11/2008)                    DWC-AD form100 (DEU)

**STATE OF CALIFORNIA**
**Division of Workers' Compensation – Medical Unit**
P.O. Box 71010, Oakland, CA 94612
(510) 286-3700 or (800) 794-6900

## QUALIFIED MEDICAL EVALUATOR'S FINDINGS SUMMARY FORM

## UNREPRESENTED INJURED EMPLOYEE CASES ONLY

### EMPLOYEE

**Rombough Eric**                                                                      **04/01/2023**

1. Employee Name (First, Middle, Last)      2. Social Sec. No. (Optional)      3. Date of Injury

**1692 Rockville Rd**          **Fairfield, CA**          94534          **(707) 419-0448**

4. Street Address          City          Zip          5. Phone

### CLAIMS ADMINISTRATOR (*if none, enter Employer information*)

**Angelique Horton / MPA**

6. Name

**PO Box 67**          **Walnut Cteek, CA**          94596          **(925) 482-0012**

7. Street Address          City          Zip          8. Phone

### EVENT DATES

**01/23/2024**                    **03/11/2024**

9. Date of Appointment Call      10. Initial Examination Date      11. Date of Referral for Medical Testing/Consultation

**04/09/2024**

12a. Date QME Report Served on all Parties          12b. Date(s) of all prior report(s) served by this QME?

### DISPUTED MEDICAL ISSUES AND CONCLUSIONS

13. The following medical issues will be used to determine the injured employee's eligibility for workers' compensation benefits.

(*Check the appropriate box*)

| | Yes | No | Pending or Info. Not Sent |
|---|---|---|---|
| a. Has the condition reached permanent and stationary status or maximum medical improvement? | ☐ | ☑ | ☐ |
| b. Is there permanent impairment/disability? | ☐ | ☐ | ☑ |
| c. Did work cause or contribute to the injury or illness? | ☑ | ☐ | ☐ |
| d. If permanent disability exists, is apportionment warranted? | ☐ | ☐ | ☑ |
| e. Is there a need for current or future medical care? | ☑ | ☐ | ☐ |

f. Can this employee now return to his/her usual job?      ☐ Yes    ☑ No

If yes:

   i. Without restrictions      ☐ Yes    ☐ No,    If YES, Date: _____

   ii. With restrictions      ☐ Yes    ☐ No,    If YES, Date: _____

### BASIS FOR CONCLUSIONS

(*Check the appropriate box*)

| | Yes | No | Pending or Info. Not Sent |
|---|---|---|---|
| 14. Are there subjective complaints? | ☑ | ☐ | ☐ |
| 15. Are there any abnormal physical or psychological examination findings? | ☑ | ☐ | ☐ |
| 16. Are impairments described and measured using: | | | |
| (For non-psyche injuries) the AMA Guides? | ☐ | ☐ | ☐ |
| (For psyche injuries) the GAF and 2005 PD Schedule? | ☑ | ☐ | ☐ |

| | Yes | No | Pending or Info. Not Sent |
|---|---|---|---|

17. If the AMA Guides are used, are percentages of impairment stated? ☐ ☐ ☐
18. Are there any relevant diagnostic test results (x-ray/laboratory)? ☐ ☐ ☐
19. What are the diagnoses? (List)  PTSD, MDD, Adjustment Disorder, Insomnia

20. Were medical records reviewed? ☑ ☐ ☐

21. Were other physicians consulted? ☐ ☑

22. Are there any unresolved disputed issues beyond the scope of your licensure or clinical competence that should be addressed by an evaluator in a different specialty? ☐ ☑

23. If the answer to # 22 is yes, what disputed issue(s)?_____

24. Based on the answer in # 23, what specialty (or specialties)?_____

**QME**

22. Signature: _____  Date: 04-09-2024

23. Name: **Dr. Vladimir Bokarius MD, PhD, QME**    Specialty: **Psychiatry**

24. Street Address: **2970 Hilltop Mall Rd, Ste 101** City: **Richmond, CA**    Zip: **94806**

25. Phone: **(855) 799-2763**    Cal. License No.:_____

### Declaration of Service of Medical - Legal Report (Lab. Code § 4062.3(i))

I, **Nataliya Bond.** _____ , declare:

*(Print Name)*

1. I am over the age of 18 and I am not a party to this case.

2. My business address is : **2970 Hilltop Mall Rd, Ste 101, Richmond, CA 94806**

3. On the date shown below, I served this QME Findings Summary Form with the original, or a true and correct copy of the original, comprehensive medical-legal report, which is attached, on each of the persons or firms named below, by placing it in a sealed envelope, addressed to the person or firm named below, and by:

A    depositing the sealed envelope with the U. S. Postal Service with the postage fully prepaid.

B    placing the sealed envelope for collection and mailing following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the U. S. Postal Service in a sealed envelope with postage fully prepaid.

C    placing the sealed envelope for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

D    placing the sealed envelope for pick up by a professional messenger service for service. *(Messenger must return to you a completed declaration of personal service.)*

E    personally delivering the sealed envelope to the person or firm named below at the address shown below.

| Means of service: *(For each addressee, Enter A – E as appropriate)* | Date: | Addressee and Address: |
|---|---|---|
| **B** | **04/09/24** | **Rombough Eric, 1692 Rockville Rd, Fairfield, CA 94534** |
| **B** | **04/09/24** | **Angelique Horton via Fax: 925-946-4183** |
| **B** | **04/09/24** | **Tiffany Corona, Edq via Fax: 916-443-0869** |
| | | |

When report addresses PD:     n/a                              n/a

Disability Evaluation Unit, DWC, **n/a**

**I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

Date Signed:     04-09-2024

*Nataliya Bond.*
(Signature of Declarant)

**Nataliya Bond.**
(*Print Name*)

# INSTRUCTIONS FOR QME FORM 111
## USE THIS FORM ONLY WHEN THE INJURED EMPLOYEE IS UNREPRESENTED

To the QME: You are required by Labor Code section 4062.3(i) to summarize the medical findings from your comprehensive medical-legal evaluation on the form prescribed by the Administrative Director.  Please complete the form in its entirety.

Employee Information:  Fill in the employee's full name, address, telephone number and date of injury.

Event Dates: Complete dates that patient called for an appointment, date of initial examination, date referred for consultation(s), if any, and date(s) report(s) served on all parties.  Supplying these dates is a legal requirement.

Disputed Medical Issues and Conclusions: Complete this section by checking appropriate box and stating what page(s) or section of the medical legal report contain the narrative for details. If diagnostic or laboratory tests have been ordered and the results or a medical records request is pending, check that box.  If you cannot render opinions because of pending information, please complete and serve the report to comply with the 30-day time requirement and state what issues could not be evaluated.

Basis for Conclusions:  Check appropriate box for each question on form.  For diagnoses, please briefly summarize the diagnoses in lay terms where possible, except when you deem that not advisable in disputed claims involving injury to the psyche.  Also, list the name and specialty for other physicians who provided information used in the medical legal report.

Need for Additional Evaluation in Another Specialty:  Labor Code section 4062.3 directs each evaluator to address all contested medical issues arising from all injuries reported on one or more claim forms prior to the evaluator's initial evaluation.  Each evaluator is expected to address permanent impairment consistent with the AMA guides for the evaluator's specialty, or for disputed injuries to the psyche consistent with the global assessment of functioning (GAF) as directed in the 2005 Permanent Disability Schedule adopted by the Administrative Director effective 1/1/2005. In the event there are contested medical issues outside of the scope

of your licensure or clinical competence that require evaluation by a physician in a different specialty, complete the information required in questions 22 through 24, and serve a copy of your report on the Medical Unit of DWC.

<u>QME Signature:</u> Remember under the Labor Code, all your reports must be signed under the penalty of perjury. You are required to serve the medical legal report and this form on the employee (unless the claim involves a disputed injury to the psyche and section 36.5 of Title 8 of the California Code of Regulations applies and provides for a different method of service), the claims administrator (if none, the employer) and whenever the report finds permanent impairment and permanent disability, on the Disability Evaluation Unit (DEU) having jurisdiction over the employee's area of residence.

<u>Declaration of Service of Medical – Legal reports:</u> Labor Code sections 139.2(j)(1)(A) and 4062.3 (i) and section 38 of Title 8 of the California Code of Regulations require the QME to serve the medical-legal report and this form on the claims administrator, or if none the employer, and the injured worker (except when section 36.5 of Title 8 of the California Code of Regulations applies) within 30 days from the commencement of the examination, unless certain conditions are met. Please complete the proof of service to show the date the report was served on the parties and the Disability Evaluation Unit.